UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, )<br>)<br>      Plaintiff, )<br>)<br>      v. )<br>)<br>)<br>MAMSI LIFE AND HEALTH )<br>INSURANCE COMPANY, et al., )<br>)<br>      Defendant. )<br>) | Case No.: 1:05CV02450 (ESH) |

**DEFENDANT MAMSI LIFE AND HEALTH INSURANCE COMPANY'S
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Local Rule 7(h), Defendant MAMSI Life and Health Insurance Company ("MLH"), by and through counsel, King Pagano Harrison, respectfully submits the following Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment.

**A.    <u>The ERISA Health Benefits Plan at Issue</u>**

1.    The MLH Health Benefits Plan (the "Plan") at issue is a private employer-sponsored benefit plan. *See* Complaint at ¶ 7; *see also* MAMSI Group Hospital and Insurance Policy Contract Face Sheet [Group Agreement] (attached as Exhibit A).[1] The Plaintiff is a covered dependent under the terms of the Plan. *See* MLH Group Certificate, Administrative Record ("Admin. Rec.") at pp. 288-90.[2]

---

[1] In order to protect the privacy of the Plaintiff, MLH does not identify the Employer by name in its moving papers. There is no dispute that the Plan at issue was sponsored by the Employer.

[2] For ease of reference, the Administrative Record (Bates Labeled 0000001-00000796) has been abbreviated to "Admin. Rec." and the particular pin-point citations are identified without the series of preceding zeroes.

2. MLH and the Employer agreed that, in exchange for the payment of periodic premiums, MLH would provide certain hospital and medical benefits to the group enrollees pursuant to the terms of a Group Certificate and other applicable plan documents (i.e., endorsements, riders, etc.). *See* Group Agreement ¶ 2 and Article 9.3 (attached hereto as Exhibit A).

3. During the period relevant to the issues in dispute, MLH acted as the administrator of the Plan. Pursuant to the terms of the Group Agreement, MLH was given broad discretion to interpret and administer the terms of the Plan. Specifically, Article 9.3 of the Group Agreement provides that MLH shall:

> adopt reasonable policies, procedures, rules and interpretations to promote orderly and efficient administration of this Contract, and the Employer agrees to cooperate with MLH in administering such rules and regulations.

*See* Group Agreement, Article 9.3 (Ex. A).

**B.  Plaintiff's Care at River Oaks Hospital**

4. Plaintiff, a 20 year old college student, was admitted to River Oaks Hospital ("River Oaks") in New Orleans, Louisiana on October 13, 2004. *See* River Oaks Admission History (Admin. Rec. at pp. 318-23); IPRO Re-Review Decision Dated April 18, 2006 (Admin. Rec. at pp. 764). Upon admission, River Oaks diagnosed Plaintiff with bulimia nervosa. *See* River Oaks Admission Hist. (Admin. Rec. at p. 318); April 18, 2006 IPRO Decision (Admin. Rec. at p. 764).

5. The Plaintiff's admitting physical exam, laboratory workup and vital signs were all normal. *See* River Oaks Hospital Admitting Patient History & Physical Exam (Admin. Rec. at pp. 321-23); River Oaks Admission Lab-Workup and Results Report (Admin. Rec. at pp. 505-10, 512). In addition, Plaintiff weighed 119.2 pounds upon admission. *See* October 14, 2004

River Oaks Diet History/Nutrition Assessment (Admin. Rec. at pp. 357-58). An admitting River Oaks dietician explicitly stated that the optimal weight for a person who is 5 feet 2 inches tall (like Plaintiff) is 110 pounds, plus or minus 10%. *See* River Oaks Diet Hist./Nutrition Assessmt. (Admin. Rec. at p. 357). While hospitalized, Plaintiff maintained a weight between 115 and 125 pounds. *See* April 18, 2006 IPRO Decision (Admin. Rec. at p. 764); IPRO Review Decision dated May 26, 2005 (Admin. Rec. at p. 749).

6.  Plaintiff remained at River Oaks until November 8, 2004. *See* Plaintiff's Medical Record Progress Notes (Admin. Rec. at p. 500). During her stay, she received both individual and group therapy. Plaintiff's physician did not begin treating Plaintiff with medication until approximately October 26, 2004, her thirteenth day of inpatient care. *See* Plaintiff's Medical Record Physician Orders (Admin. Rec. at p. 364). At no time during her inpatient stay did Plaintiff ever express any suicidal ideations or threats of harm to herself or others. *See generally* Plaintiff's Medical Record (Admin. Rec. at pp. 318-546) (citing physician progress notes taken during Plaintiff's inpatient care).

C.  **MLH Reviews The Request For Coverage And Denies The Claim Because Inpatient Care Was Not Medically Necessary**

7.  Plaintiff's physician requested that MLH cover her October 13-November 8, 2004 inpatient treatment shortly after it began. *See* October 14, 2004 MLH Coverage Decision Letter to Plaintiff (Admin. Rec. at pp. 1-2). In reviewing the claim, the Plan utilized its criteria for determining medical necessity of an inpatient stay for the treatment of eating disorders, which are set forth in the MAMSI Behavioral Heath and Psychiatric Level of Care Criteria for Eating Disorders ("Eating Disorder Care Criteria"). *See* October 14, 2004 MLH Coverage-Decision (Admin. Rec. at pp. 1-2); Eating Disorder Care Criteria (Admin. Rec. at pp. 303-05); Group Certificate, Definition of Medical Necessity (Admin. Rec. at p. 279). The Eating Disorder Care

Criteria for inpatient treatment are comprehensive and require a finding of at least one of the following criteria:

> I.   severe weight loss: i.e., refusal to maintain weight at or above 75% of optimal weight;
>
> II.  medical complications related to weight loss that require 24-hour skilled nursing care such as a heart rate less than 40, blood pressure less than 90/60, temperature less than 97, severe orthostatic changes, severe hypokalemia or hyponatremia, esophageal rupture, or other significantly abnormal test results;
>
> III. comorbid biomedical issues such as diabetes or pregnancy that worsen due to the weight loss and need 24-hour skilled nursing care; or
>
> IV.  comorbid psychiatric/substance abuse issues that meet inpatient rehabilitation criteria.

*See* Eating Disorder Care Criteria (Admin. Rec. at pp. 303-05); October 14, 2004 MLH Coverage-Decision (Admin. Rec. at pp. 1-2); December 2, 2004 Internal Appellate Review Decision re inpatient coverage determination (Admin. Rec. at pp. 264-65); May 26, 2005 IPRO Decision (Admin. Rec. at pp. 748-51); April 18, 2006 IPRO Decision (Admin. Rec. at pp. 762-67). The Eating Disorder Care Criteria also incorporates the Group Certificate's definition of Medical Necessity, which is as follows:

> health services which are reasonably necessary and in the exercise of good medical practice in accordance with professional standards accepted and commonly available in the United States for treatment of Sickness or Injury as determined by [MLH]. The services must 1) be appropriate and necessary for the symptom's diagnosis, or treatment of the condition; 2) be provided for the diagnosis or direct care or treatment of the condition; 3) not be provided for convenience; 4) be performed or provided in the least costly setting or manner appropriate to diagnose or treat the Injury or Sickness … The fact that a Physician may prescribe, recommend or approve a procedure or treatment does not, in itself, make that procedure or treatment Medically Necessary.

4

*See* Group Certificate, Definition of Medical Necessity (Admin. Rec. at p. 279). The Group Certificate grants MLH broad discretion in determining what health services are medically necessary. *See id.*

8.  Morton Albert, M.D., the Behavioral Health Services Medical Director ("BHS Medical Director") at MLH, reviewed the available medical data regarding Plaintiff's inpatient admission and hospitalization, together with the plan documents, and determined that Plaintiff's medical condition did not meet the criteria for inpatient psychiatric treatment. *See* October 14, 2004 MLH Coverage Decision (Admin. Rec. at pp. 1-2). Dr. Albert found that Plaintiff's inpatient admission was not medically necessary and, therefore, not covered by the terms of the Plan. *See id.* Specifically, Dr. Albert stated that:

> [a]ccording to the MAMSI Behavioral Health Department of Psychiatric Level of Care Criteria for eating disorders (2003), medical necessity for acute psychiatric inpatient admission is substantiated by one of the following: medical complications which require 24 hour skilled nursing care, comorbid biomedical issues which are worsening due to the patient's inability to manage the eating disorder, or comorbid psychiatric issues which require 24 hour skilled nursing care.

*See id.*

9.  According to Dr. Albert, Plaintiff did not present to River Oaks with any condition satisfying any of the above-outlined Eating Disorder Care Criteria or any other condition warranting inpatient treatment. In this regard, Dr. Albert stated that:

> [i]nformation available for this review indicates that the member presents with symptoms of bulimia characterized by a history of binging and purging and restricting meal intake. At the time of this request, the member presented with a normal height and weight, normal lab values, there were no reported medical consequences of the eating disorder which required 24 hour monitoring; and there were no coexisting psychiatric, substance abuse, or medical issues. Therefore, the medical necessity for

5

>   admission to an acute inpatient setting for an eating disorder could
>   not be substantiated.

*See* October 14, 2004 MLH Coverage-Decision (Admin. Rec. at pp. 1-2). More specifically, Plaintiff's weight upon admission was 119. *See* River Oaks Diet Hist./Nutrition Assess. (Admin. Rec. at p. 357). Plaintiff's vital signs were all normal: heart rate (88); blood pressure (110/70); and temperature (97.7). *See* River Oaks Admit. Patient Hist. & Physical Exam (Admin. Rec. at p. 322). Plaintiff, likewise, did not have any other disease or comorbidity that complicated her care. *See id.*; *see generally* Plaintiff's Medical Record (Admin. Rec. at pp. 318-546) (citing progress notes and physician orders during inpatient stay). Lastly, she did not display any suicidal ideations or substance abuse issues. *See* River Oaks Suicide Risk Assessment (Admin. Rec. at p. 346). Based on the foregoing, MLH denied Plaintiff's claim for inpatient hospitalization at River Oaks on October 14, 2004. *See* October 14, 2004 MLH Coverage-Decision (Admin. Rec. at pp. 1-2).

**D.   On Appeal, An Independent Psychiatrist And An MLH Medical Director Also Found That Plaintiff's Inpatient Care Was Not Covered By The Plan**

10.   On November 9, 2006, Plaintiff's treating physician, George Daul, M.D., appealed MLH's denial of Plaintiff's request for coverage of her October 13 through November 8, 2004 inpatient admission. *See* November 9, 2004 Letter from George Daul, M.D. to MLH Appeals Coordinator (Admin. Rec. at p. 4). Dr. Daul's appeal request failed to cite any substantive reason to overturn the prior coverage decision. *See id.*

11.   On appeal, MLH forwarded documentation regarding Plaintiff's inpatient admission to an independent Consulting Case Reviewer, Sheldon Glass, M.D., to review MLH's coverage decision. *See* Consultant Case Review Summary and Decision dated November 22, 2004 (Admin. Rec. at pp. 262-63). Based upon his review, the independent Consultant Case Reviewer, a board-certified psychiatrist, found that Plaintiff did not meet the inpatient admission

6

criteria for eating disorders upon admission to River Oaks or at any time during her inpatient stay. *See id.*

12. Based, in part, on the recommendation of the independent Consultant Case Reviewer, MLH's Senior Medical Director, Vera Dvorak, M.D., upheld MLH's coverage reasoning that:

> [a]ccording to the medical records, there were no medical complications of your eating disorders which required 24 hour nursing care. There were no comorbid biomedical issues as evidence by normal laboratory tests and stable vital signs. There was no documentation of severe weight loss. There were no significant comorbid psychiatric issues requiring 24 hour skilled nursing assessment. You were inpatient for 13 days before an antidepressant was prescribed. There are no documented cognitive impairments or isolation from peers or community.

*See* December 2, 2004 Appeal Decision (Admin. Rec. at pp. 264-65).

E. **Following A Complaint To The D.C. Department Of Health, Two Additional Independent Psychiatrists Found That Plaintiff's Inpatient Stay Was Not Medically Necessary**

13. Plaintiff then appealed MLH's coverage decision for her inpatient admission to the District of Columbia's Department of Health, Office of General Counsel ("Grievance and Appeals Office"). *See* February 28, 2005 Letter from Patrick Kelly to MLH (Admin. Rec. at p. 268). Plaintiff's appeal was accepted by the Grievance and Appeals Office and forwarded to IPRO, Inc. ("IPRO") for an external review. *See* March 11, 2005 Letter from Patrick Kelly to Plaintiff's Counsel (Admin. Rec. at pp. 547-48). IPRO is an independent review organization under contract with the District of Columbia to provide expert opinions regarding clinical issues that the D.C. Department of Health is not qualified to make on its own. IPRO has no business affiliation with MLH.

7

14. MLH responded to IPRO's review by submitting a letter to Grievance and Appeals Coordinator, Patrick Kelly, explaining that Plaintiff's inpatient admission was not medically necessary. *See* March 9, 2005 Letter from MLH to Patrick Kelly (Admin. Rec. at pp. 269-70). The letter enclosed the relevant documentation that MLH reviewed, including Plaintiff's Group Certificate, the Eating Disorders Care Criteria, the initial coverage denial letter, Plaintiff's appeal letter, the medical record and the concurring decision and rationale of the independent Consultant Case Reviewer and Senior MLH Medical Director. *See* March 9, 2005 Letter from MLH to Patrick Kelly (Admin. Rec. at pp. 269-70).

15. After reviewing the documentation submitted by both Plaintiff and MLH, IPRO upheld MLH's coverage decision. *See* May 26, 2005 IPRO Decision (Admin. Rec. at pp. 748-51). Two IPRO clinical practitioners (individually "Reviewer-1" and "Reviewer-2") reviewed Plaintiff's appeal of the coverage decision for the inpatient care she received at River Oaks from October 13 to November 8, 2004.[3] *See id*. Both Reviewers 1 and 2 are board-certified and licensed to practice psychiatry, are currently practicing and have no governmental or professional disciplinary sanctions taken or pending against them. *See id*.

16. Pursuant to the request of counsel for Plaintiff, IPRO conducted a telephone hearing regarding Plaintiff's claim for coverage.[4] The hearing included Plaintiff's counsel, one of Plaintiff's physicians, an IPRO representative and an IPRO Reviewer. *See id*. at p. 748. There was no representative of MLH present at the hearing.

---

[3] Since the D.C. Department of Health independent review process is blinded, neither Plaintiff nor MLH were provided with the names of the psychiatrists performing the review.

[4] During the call, Plaintiff's counsel discussed and submitted new information that he believed IPRO should consider in its review of MLH's coverage decision for Plaintiff's inpatient care. While IPRO did not initially consider this information because it was untimely, it has since taken that information into consideration in a supplemental review requested by the Court. *See* May 20, 2005 Letter from Plaintiff's Counsel to IPRO Director of Corporate Programs & External Review (Admin. Rec. at pp. 553-741) (citing plaintiff's counsel's letter and all exhibits attached to same, which were submitted as additional information to be considered).

17. Following the hearing, IPRO considered the information it gathered and reviewed the relevant documentation submitted, which included letters from Plaintiff's counsel, letters to and from the DC Grievance and Appeals Office, Plaintiff's medical records from River Oaks, letters from MLH's Medical Directors, the independent Consultant Case Reviewer's Decision, along with the MLH Group Certificate and other plan documents. *See id*. at pp. 748-51.

18. Based upon the above-referenced submissions, Reviewer-1 concluded that Plaintiff's inpatient stay was not medically necessary. Reviewer-1 reasoned that Plaintiff should have first been treated with anti-depressant medication on an outpatient basis coupled with psychotherapy, medical management and nutritional counseling. Reviewer-1 specifically stated that:

> Additionally, there were other indications for this outpatient trial of medication. She clearly had elements of depression as noted in her admission note. Finally, her family history is loaded with antidepressant responsive syndromes and this too would justify the use of antidepressant medication as an outpatient.
>
> Based on the above, the medical necessity for inpatient hospitalization is not substantiated and the insurer's denial should be upheld.

*See id*. at p. 750.

19. Reviewer-2 concurred, finding that:

> Based upon the information available[,] acute, inpatient psychiatric hospitalization was not medically necessary during the dates 10/13/01-11/8/04. The insurer's criteria for acute hospitalization . . . were not met, and there were no other unusual conditions present that made inpatient hospitalization medically necessary.

*See id*. at p. 750-51.

20. By letter dated June 2, 2005, MLH accepted IPRO's recommendation that Plaintiff's inpatient psychiatric hospitalization was not medically necessary. *See* June 2, 2005

9

Letter from MLH to Patrick Kelly (Admin. Rec. at p. 754). As a result, MLH upheld its prior coverage decision. *See id.* at p. 754.

F.  **Following A Second Review By IPRO, The Company Yet Again Finds That Inpatient Treatment Was Not Warranted**

21.  By agreement of the parties and the Court IPRO conducted a second external review of Plaintiff's inpatient hospitalization claim. In IPRO's second review of the claim, it re-reviewed the medical documentation, including additional documentation submitted by Plaintiff's counsel and once again upheld MLH's decision to deny coverage of Plaintiff's inpatient admission and hospitalization at River Oaks from October 13 to November 8, 2004. *See* April 18, 2006 IPRO Decision (Admin. Rec. at pp. 762-67).

22.  Two clinicians (individually "Re-reviewer-1" and "Re-reviewer-2") evaluated Plaintiff's appeal of MLH's adverse coverage decision regarding her inpatient services from Rivers Oaks during October and November 2004. *See id.* Both Re-reviewers 1 and 2 are board-certified and licensed to practice psychiatry. *See id.* Moreover, the two reviewers have no governmental or professional disciplinary sanctions taken or pending against them. *See id.*

23.  Re-reviewer-1 stated that, upon assessing MLH's coverage decision and reviewing the medical documentation, including new documentation submitted by Plaintiff's counsel, he upheld MLH's coverage denial because Plaintiff's inpatient stay simply was not medically necessary. *See id.* Re-reviewer-1 concluded that:

> [b]ased upon a review of the information available, acute psychiatric hospitalization was not medically necessary from 10/13/04-11/8/04. The insurer's denial is therefore upheld. [Plaintiff] was not suffering with severe weight loss, severe medical complications related to her eating disorder, or severe co-morbid conditions that required inpatient care. Although suffering with an eating disorder and a personality disorder, Ms. [Plaintiff's] condition could have been safely and adequately treated at a PHP level of care. [Plaintiff] was not acutely psychotic, imminently at

> risk of severe injury to herself or others, or in need of 24-hour skilled nursing care.

*Id.* Explaining further, Re-reviewer-1 emphasized that Plaintiff's medical records showed that she weighed 119 pounds at admission, maintained a weight range of 115-125 pounds during hospitalization, had no severe medical complications and no co-morbid conditions related to severe weight loss. *See id.*

24. Re-reviewer-2 agreed with his colleague that the denial should be upheld, stating that:

> I do not see any clinical grounds to justify inpatient admission in October 2004 when comprehensive outpatient programs were still available.

*Id.* Indeed, Re-reviewer-2 underscored the fact that hospitalization for bulimia nervosa is required when medical instability or behavioral disturbance cannot be treated in a less restrictive level of care. Plaintiff, however, had normal lab results upon admission and had not received comprehensive outpatient care or medication prior to admission. *See id.*

25. By letter dated May 1, 2006, MLH accepted the second recommendation provided by IPRO and yet again upheld its decision to deny coverage for inpatient services at River Oaks from October 13 to November 8, 2004. *See* May 1, 2006 Letter from Karyn Houck, MLH, to Patrick Kelly (Admin. Rec. at p. 769).

**G.     Plaintiff's Separate Claim For Partial Hospitalization Benefits**

26.     On November 9, 2004, Plaintiff began a non-emergent, outpatient partial hospitalization program at River Oaks.  *See* November 11, 2004 MLH Partial Hospitalization Coverage-Decision (Admin. Rec. at pp. 254-57).  Partial hospitalization programs provide hospital-based treatment that does not allow for overnight stays.  Usually the treatment is on-site or physically close to an inpatient/psychiatric facility.  Group activities are part of the therapy including psychotherapy groups and other rehabilitation treatment.  *See generally* Internet Encyclopedia Wikipedia at http://en.wikipedia.org/wiki/Partial_hospitalization.

27.     Plaintiff, however, failed to seek or receive precertification from MLH prior to the initiation of the partial hospitalization program.  *See* November 11, 2004 MLH Partial Hospitalization Coverage-Decision (Admin. Rec. at pp. 254-57).  Plaintiff's MLH policy requires that members or their providers must seek and receive precertification for non-emergent requests for treatment in order to be covered.  *See* Group Certificate (Admin. Rec. at p. 280).

28.     Plaintiff's providers, however, did not submit a request to MLH for coverage of the partial hospitalization until after she had already initiated treatment.  *See* November 11, 2004 MLH Partial Hospitalization Coverage Decision (Admin. Rec. at pp. 254-57).  On November 11, 2004, MLH denied Plaintiff's request for coverage because she failed to obtain precertification per the terms of her policy.  *See id.*; Group Certificate (Admin. Rec. at p. 280).

29.     In its November 11, 2004 denial letter, MLH explained its internal appeal review process.  *See* November 11, 2004 MLH Partial Hospitalization Coverage Decision (Admin. Rec. at pp. 254-57).  Plaintiff had 180 days in which she could appeal an initial adverse coverage decision regarding her November 9, 2004 partial hospitalization.  *See id*.  Plaintiff, however,

12

never appealed MLH's November 11, 2004 coverage decision. *See* generally, Administrative Record.

30. Throughout the appeal process, MLH compiled an Administrative Record that included documents relating to MLH's adverse coverage decision, its internal review of the same and the external review of the decisions. (*See* generally, Administrative Record).

31. MLH filed the Administrative Record with this Court and served the same upon the Plaintiff on July 21, 2006. *See* Administrative Record.


Date: October 16, 2006                                    Respectfully submitted,



                                          /s/ Christopher Flynn_____
                                          Christopher Flynn, Esq.
                                          William C. Silvis, Esq.
                                          KING PAGANO HARRISON
                                          1730 Pennsylvania Avenue, NW
                                          Suite 900
                                          Washington, DC 20006
                                          Ph: 202-371-6800
                                          Fax: 202-371-6770
                                          cflynn@kph.com
                                          wsilvis@kph.com

# EXHIBIT A

MAMSI LIFE AND HEALTH INSURANCE COMPANY

CONTRA

Rep. No: 1899
Group No/Policy No: M14106

# MAMSI LIFE AND HEALTH INSURANCE COMPANY
# GROUP HOSPITAL AND INSURANCE POLICY CONTRACT

## FACE SHEET

THIS CONTRACT is made this 12th day of January, 2004 by and between MAMSI Life and Health Insurance Company (hereinafter referred to as "MLH") and            REDACTED            (hereinafter referred to as "employer" or "group" or "policyholder").

IN CONSIDERATION of timely payment of the periodic Premium by Employer, MLH agrees to provide and/or arrange for hospital and medical services to Enrollees of the Group in accordance with the terms, provisions, exclusions and limitations of this Contract and the applicable terms of the MLH Group Certificate and any endorsements or riders attached hereto and made a part hereof (hereinafter collectively referred to as the "Contract").

Premium Payment Method: Payment to be made to MAMSI LIFE AND HEALTH INSURANCE CO.

IT IS AGREED:

A. This Contract shall be effective on 01/01/04 and will remain in effect for an initial contract year of 12 consecutive months, ending 12/31/04 (hereinafter referred to as the "Anniversary Date"). Thereafter, the Contract shall be renewed automatically from year to year for additional twelve (12) month periods at the then current Premium rate, unless terminated by either party as provided herein.

B. Coverage shall begin for new hires: DATE OF HIRE

C. Monthly Premiums shall be:

| | Employer Group Rates | Federally Mandated Continuation (if applicable) |
|---|---|---|
| Employee Only | $698.96 | $698.96 |
| Employee and Spouse | $1488.78 | $1488.78 |
| Employee and Child | $1286.09 | $1286.09 |
| Employee and Children | $1978.06 | $1978.06 |
| Employee and Spouse and Child(ren) | $1978.06 | $1978.06 |

The premium rates set forth above are subject to change depending on the final actual enrollment demographics of the Group. The final premium rates will be determined at the expiration of the first thirty (30) days of the term of this Agreement, and will be as set forth on the third (3rd) invoice you receive from MLH. The Group agrees to pay the adjusted premium for the term of this Agreement.

D. Benefits; which mean the following Group Certificate and any endorsements or riders: DC07P00*LGhC

E. Open Enrollment Period: DEC 2004

F. Student Dependent Limiting Age (if different from Section 2.2): 19/23

G. Employer Contribution: Employer Contribution: Employer represents that Employer shall contribute at least twenty-five percent (25%) of the cost of "Employee Only" coverage as shown on the Face Sheet of this Contract towards the cost of each Insured Person's coverage. Employer shall notify MLH in the event that Employer fails to meet the aforementioned contribution minimum.

[Insurance Company Name]                                                                CONTRACT

H.  **Employer Participation:** Employer represents that Employer shall maintain a minimum participation level of at least seventy five percent (75%) of the Eligible Employees as defined in the Group Certificate during the entire term of this Contract, in the health benefit plans offered under this Contract by MLH, and by affiliate companies of MLH. Employer shall notify MLH in the event that Employer fails to meet the aforementioned minimum participation standard.

## ARTICLE 1: ENTIRE CONTRACT AND CHANGES

1.1  The Group Policy booklet, the Group Specification Summary, any master application, any individual application, identification cards, any riders, endorsements, and any amendments, including any Certificate, rider, endorsement, or amendment issued after the Contract Effective Date constitute the entire contract. All statements made by the Policyholder or by the persons insured will be considered representations and not warranties. No written statement made by a person insured may be used in a contest unless a copy of the statement is furnished to the person insured or his or her beneficiary or personal representative.

1.2  The Contract may be changed at any time by written agreement between the Policyholder and the Company. Only the President of the Company, or his designee, can authorize a change of the Contract or its benefits. Insurance provided by the Group Policy may be changed or canceled without the consent of or prior notice to any Insured Person.

## ARTICLE 2: ELIGIBILITY

2.1  Employees of Employer and their Dependents who are eligible for the health benefits program established by Employer, and who comply with any probationary or other requirements established by Employer as set forth on the Face Sheet appended hereto and with the terms and provisions of this Contract, are eligible to be enrolled hereunder so long as they enroll within thirty (30) days from the date of their eligibility.

2.2  Eligible Dependents of eligible Insured Persons are as outlined in the Group Certificate. Any exceptions to the criteria for such other Dependents as outlined in the Group Certificate, if any, shall be described on the Face Sheet of this Contract.

2.3  No change in the Employer's eligibility or participation requirements shall be permitted to affect eligibility or enrollment under this Contract unless such change is agreed to in writing by MLH.

## ARTICLE 3: ENROLLMENT

3.1  Eligible Employees and their Eligible Dependents may enroll during the Open Enrollment Period by submitting completed application forms provided by MLH. New employees and their Dependents must enroll or be enrolled within thirty (30) days from the date of eligibility. If a person is not enrolled within thirty (30) days of first becoming eligible, he or she cannot enroll until the next Open Enrollment Period.

3.2  There shall be an annual Open Enrollment Period, as specified on the Face Sheet, during which all Eligible Employees are offered a choice to become covered under this Contract.

3.3  There shall be a Special Enrollment Period for Employees and their Eligible Dependents as follows:
   A.  If the Eligible Employee (or Eligible Dependent) fails to enroll within thirty (30) days of becoming eligible, the employee (or Eligible Dependent provided the employee is enrolled) may enroll during the Special Enrollment Period. The Special Enrollment Period is the thirty day period following termination of employee's (or Eligible Dependent's) other health coverage provided:
      1.  The employee or Dependent was covered under a group health plan or had health insurance coverage at the time coverage was previously offered;
      2.  The employee's (or Eligible Dependent's) coverage described in 1. above was:
         (i)  under a COBRA continuation and the coverage under such provision was exhausted; or
         (ii) was not under such a provision and either the coverage was terminated as a result of loss of eligibility for the coverage (including as a result of legal separation, divorce, death, termination of employment, or reduction in the number of hours of employment) or employer contributions toward such coverage were terminated; and
      3.  the employee requests such enrollment for himself or herself (and the Eligible Dependent) not later than thirty (30) days after the date of exhaustion of coverage.

**MAMSI LIFE AND HEALTH INSURANCE COMPANY**                                    CONTRA(

B.  If an employee acquires a Dependent through marriage, birth or adoption, or placement for adoption, (where the employee is not enrolled and the employee has met any waiting period applicable to becoming a participant under the health insurance coverage and is eligible to be enrolled for insurance coverage but for failure to enroll during a previous enrollment period) the newly acquired Dependent may be enrolled as a Dependent of the employee provided the employee also becomes enrolled. In the case of the birth or adoption of a child, the spouse of the employee may also be enrolled as a Dependent of the employee if such spouse is otherwise eligible for coverage. Such enrollment shall be made during the Special Enrollment Period which shall be a period of thirty days beginning on later of (i) the date of the marriage, birth, adoption or placement for adoption or, if health coverage is not available, (ii) the date the Dependent coverage is made available.

3.4  The Employer agrees that each employee shall receive pertinent Open Enrollment information which shall include literature supplied by MLH.

## ARTICLE 4: EFFECTIVE DATE OF COVERAGE

4.1  Subject to receipt by MLH of the applicable monthly Premiums and completed enrollment applications for each employee and their Eligible Dependents, coverage will become effective on the date stated on the Face Sheet or after complying with any probationary or other requirements established by Employer, whichever is later. For those enrolling during the Special Enrollment Periods, see Article 4.2. For any newly acquired Dependent of an Insured Person (placement of a child for the purpose of adoption, birth or marriage), MLH must be notified within thirty-one (31) days of such an addition in order for coverage to become effective. Coverage of newborn Dependents will be effective from the date of birth provided: 1) at least one other family member, other than the Insured Person, is covered under the contract; 2) the newborn is added to the Insured Person's coverage within thirty-one (31) days from the date of birth; and 3) any applicable Premium is paid for the addition of a Dependent. Insured Persons with "Employee Only" coverage must enroll the newborn Dependent during the thirty-one (31) day period following the birth and make arrangements to convert their contract to the appropriate level of coverage, for coverage to be effective from the date of birth. For an Eligible Employee, or Eligible Dependent applying for enrollment during the Group's Open Enrollment Period, the Coverage Effective Date will be the Anniversary Date.

4.2  Subject to receipt by MLH of the applicable monthly Premiums and completed enrollment applications for each employee and the employee's Eligible Dependents enrolled during the Special Enrollment Period, coverage will become effective on:
a)  The date of written application for employees or Dependents enrolled pursuant to Article 3.3 A of this Contract.
b)  For an employee or Dependent enrolled pursuant to article 3.3 B of this Contract, the coverage Effective Date shall be as follows:
  1.  In the case of marriage, on the first day of the first month beginning after the date written application is received;
  2.  In the case of Dependents birth, the date of birth; or
  3.  In the case of adoption or placement for adoption, the date of adoption or placement.

## ARTICLE 5: MONTHLY PAYMENTS

5.1  The Employer shall pay to MLH on behalf of each Insured Person and Dependent the monthly Premium specified on the Face Sheet of this Contract. The first Premium due date is the Contract Effective Date. Subsequent Premiums are due and payable on each succeeding Premium Due Date. If a Member's enrollment status changes during the course of the year, Employer's Premium on behalf of such Member shall change accordingly.

5.2  The Premium is due monthly beginning with the date stated on the Face Sheet. If such Premium payment is not made in full by Group on or prior to the Premium due date, a thirty-one (31) day grace period shall be granted to Group for payment. If payment is not received by the expiration of the grace period, then this Contract may be terminated by MLH and MLH shall have no liability for benefits as of the effective date of termination of the Contract. The Employer shall be liable to MLH for the payment of a pro rata Premium for the time the certificate was in force during the grace period. All amounts due MLH outstanding subsequent to the grace period shall be subject to a late penalty charge of 1.50% of the total amount due calculated for each thirty-one (31) day period, or portion thereof, the amount due remains outstanding. Furthermore, in the event of termination of this Contract, Group agrees to reimburse MLH for expenses related to collection of amounts due, including attorney's fees (25% of the amount declared due and owing MLH subsequent to the last day for which Premiums were paid).

MAMSI LIFE AND HEALTH INSURANCE COMPANY                                          CONTRA(

5.3  Employer shall pay the required total monthly Premium for additions and terminations of Members during any month as follows:

   (a) If a Member's coverage is effective within the first fifteen (15) days of the billing period (the period beginning with the date stated on the Face Sheet for which Premiums are due on a monthly basis), the full month's Premium will be due for such Member. If a Member's coverage is effective after the fifteenth (15th) day of the billing period, no Premium payment will be due for such Member for that month.

   (b) If a Member's coverage terminates within the first fifteen (15) days of the billing period, no monthly Premium payment shall be due for such Member for that month. If the Member's coverage terminates effective after the fifteenth (15th) day of the billing period, the total monthly Premium for such Member shall be due.

5.4  MLH may change the monthly Premium rate schedule by giving forty (40) days prior written notice to Employer. The monthly Premium rate schedule shall not be revised more often than once in any contract year. However, notwithstanding the above, if a change in this Contract is required by statute or regulation which increases MLH's risk under this Contract, MLH may change the monthly Premium rate schedule upon forty (40) days prior written notice to Employer.

5.5  All accounts are considered final and the accuracy of the MLH statement to the Employer is presumed correct unless the Employer notifies MLH in writing within sixty (60) days from the date that MLH sends by prepaid mail or other reasonable means such statement to Employer.

5.6  Notwithstanding anything to the contrary, the Employer agrees to notify MLH upon termination of the eligibility for coverage of any employee or any of the employee's Dependents within thirty (30) days of such termination. Failure to notify MLH shall make Employer liable to reimburse MLH for any claims paid after one hundred eighty (180) days from the termination of eligibility for coverage.

5.7  Any fees charged to MLH due to the Group having insufficient funds in the collection of the Premium payment, shall be payable by the Group to MLH as presented.

## ARTICLE 6: LIMITATIONS

6.1  To the extent that a national disaster, riot, civil insurrection, epidemic or any other emergency or similar event not within MLH's control results in the MLH facilities, personnel, or resources being unavailable to provide or arrange for the care and services it has agreed to provide in this Contract, MLH is required only to make a good faith effort to provide or arrange for such care and services, taking into account the impact of the event. In such event, MLH will be liable for reimbursement of the expenses necessarily incurred in the procurement of such care and services as an MLH Participating Provider determines were Medically Necessary and covered under this Contract to the extent prescribed by the Insurance Commission of the state in which this Contract was issued. For the purposes of this section, an event is not within MLH's control if MLH cannot exercise influence or dominion over its occurrence.

## ARTICLE 7: TERMINATION

7.1  This Contract shall be effective through the Anniversary Date and from year to year thereafter at the then current Premium rates. Notwithstanding the above, Employer may terminate this Contract on the Anniversary Date if and only if written notice is given at least sixty (60) days prior to the Anniversary Date. Coverage shall terminate on the sixty-first (61st) day from the date that the Employer sends by prepaid mail or other reasonable means, such notice to MLH.

7.2  MLH may terminate this Contract upon ten (10) days notice to Employer if any payment required to be made by Employer is not received timely. Such termination shall be no earlier than thirty-one (31) days from date for which the last Premium payment was made. Coverage may be canceled after the thirty-first (31st) day and the Employer shall be liable for the pro rata premiums due prior to the effective date of termination. In the event of such termination, Members will be provided an opportunity to convert to non-Group coverage as described in this Contract.

7.3  In the event of a material breach of any of the terms and provisions of this Contract, this Contract may be terminated by the non-breaching party, upon thirty (30) days prior written notice to the other party. Coverage shall terminate on the thirty-first (31st) day from the date the non-breaching party sends, by prepaid mail or other reasonable means, such notice to the other party.

**MAMSI LIFE AND HEALTH INSURANCE COMPANY**    CONTRA

7.4 MLH may terminate this Contract upon thirty (30) days notice if the Group fails to comply with the contribution and participation requirements defined by MLH and provided herein in sections G and H. Coverage shall terminate on the thirty-first (31st) day from the date that MLH sends, by prepaid mail or other reasonable means, such notice to the Employer.

7.5 MLH may terminate this Contract, in accordance with law of the District of Columbia and upon ninety (90) days notice to the Employer, if MLH ceases to offer group health insurance coverage in the area in which the Employer is located. Coverage shall terminate on the ninety-first (91st) day from the date that MLH sends, by prepaid mail or other reasonable means, such notice to the Employer.

7.6 MLH may terminate this Contract upon thirty (30) days notice to the Employer for failure to comply with insurance provisions that have been approved by the Commissioner of Insurance. Coverage shall terminate on the thirty-first (31st) day from the date that MLH sends, by prepaid mail or other reasonable means, such notice to the Employer.

7.7 MLH may void this contract for fraud and misrepresentation by the Member, with respect to such Members coverage.

7.8 If, immediately prior to the effective date of this Contract, a Contract between MLH and Employer concerning hospital and medical services was in effect, this Contract shall constitute an amendment and restatement of such prior Contract.

7.9 With respect to any rate change made pursuant to Section 5.4, if the Group wishes to terminate the Contract because of such rate change, the Group must notify MLH in writing of the Groups intention to terminate as a result of the increase. MLH must receive such termination notice at least twenty (20) days prior to the Effective Date of the rate change.

## ARTICLE 8: NOTICE

8.1 Any notice hereunder to be given to Employer shall be addressed to:

REDACTED

8.2 Any notice hereunder to be given to MLH shall be addressed to:
MAMSI LIFE AND HEALTH INSURANCE COMPANY
5110 RIDGEFIELD ROAD
SUITE 410
BETHESDA, MD. 20816

## ARTICLE 9: MISCELLANEOUS

9.1 This Contract shall be subject to amendment, modification or termination in accordance with any provisions hereof, or by mutual Contract between MLH and the Employer, without the consent of Enrollees.

9.2 Clerical error, by either MLH or Employer, in keeping any record pertaining to the coverage under this Contract, will not invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated.

9.3 MLH may adopt reasonable policies, procedures, rules and interpretations to promote orderly and efficient administration of this Contract, and Employer agrees to cooperate with MLH in administering such rules and regulations.

9.4 No agent or other person, except the President of MLH, or his or her designee, has authority to waive any conditions or restrictions of this Contract, to extend the time for making a payment, or to bind MLH by making any promise or representation or by giving or receiving any information. No change in this Contract shall be valid unless evidenced by an endorsement on it signed by the President of MLH, or his or her designee.

9.5 Employer must furnish MLH with any data required by MLH for coverage of Eligible Employees and their Dependents under this Contract. In addition, Employer must provide timely notification as noted herein, to MLH of any changes in membership, such as: family status, a child ceasing to be a Dependent, a divorce, or a death.

9.6 At the time of renewal, MLH may modify the product offered under this group insurance coverage if such modification is consistent with the law of the District of Columbia.

9.7 MLH may void this Contract for fraud or misrepresentation by the Employer with respect to the Group's Coverage.

**MAMSI LIFE AND HEALTH INSURANCE COMPANY** *4/27/04) Mailed original CONTRA[CT] to MAMSI Group Contracts PO Box 944 Fre[d]eri[ck]*

9.8 Employer agrees to indemnify and hold harmless MLH against any claims or liabilities for which Employer is solely responsible under the terms of this Contract. MLH agrees to indemnify and hold harmless Employer against any claims or liabilities for which MLH is solely responsible under the terms of this Contract.

9.9 It is understood that the Group, if applicable, has certain responsibilities under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Employee Retirement Income Security Act of 1974 (ERISA), and any state continuation notification requirements including but not limited to notification related to qualifying events. In the event that the Employer fails to comply with COBRA, ERISA or state requirements in such areas as notifying an individual of their COBRA and/or continuation rights, Employer agrees to indemnify and hold harmless MLH for any costs, expenses or damages including legal fees which may be incurred by MLH which are caused by the Employer's failure to perform.

9.10 This Contract is not in lieu of workers' compensation. It does not relieve any employer of any need to provide such coverage.

9.11 Employer agrees to provide reasonable good faith effort to assist MLH with the collection of data concerning disability benefits information and claims submitted under the Group's Workers Compensation plan.

9.12 Sections G and H, and Article 5 of this Contract, shall survive the termination of this Contract.

9.13 By signing below, the Employer acknowledges receiving the forms described on the Face Sheet.

9.14 Employer agrees that all action or proceedings instituted any MLH hereunder, shall, at MLH's option, be brought in a court of competent jurisdiction in the state and county in which is located the chief executive office of MLH. Whereby, the place of exclusive jurisdiction, venue, discovery, and controlling law for resolution of disputes is Montgomery County, Maryland.

This Contract is executed on the date of issue to become effective on the date stated on the Face Sheet of this Contract.

**EMPLOYER**

REDACTED
_____
(Signed and dated)


_____
(Name and title printed)

MAMSI Life and Health Insurance Company

*Thomas P Barbera*     01/12/2004
_____
(Signed and dated)


Thomas P. Barbera, President
_____
(Name and title printed)