UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE DOE, | : |
|     Plaintiff, | : |
| |   CASE NO. 1:05cv02450 (ESH) |
| v. | : |
| MAMSI LIFE AND HEALTH INSURANCE COMPANY, et al., | : |
| | : |
|     Defendants. | |

**PLAINTIFF'S CONSOLIDATED STATEMENT OF MATERIAL
FACTS NOT IN DISPUTE IN SUPPORT OF HER CROSS-MOTION FOR
SUMMARY JUDGMENT AND COUNTERSTATEMENT OF MATERIAL
FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jane Doe, by and through her attorneys HANNON LAW GROUP, LLP, respectfully presents in a consolidated pleading her Statement of Material Facts Not in Dispute in Support of Her Cross-Motion for Summary Judgment and Counterstatement of Material Facts in Opposition to Defendant's Motion for Summary Judgment. Plaintiff intends that the Court rely on both statements in support of her motion and in opposition to the motion of Defendant.

**INTRODUCTION**

Plaintiff seeks health benefits coverage for covered services under an employer-sponsored health benefits plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. The requested benefits have been denied by the Defendant, MAMSI Life and Health Insurance Company ("MAMSI"), which moved for Summary Judgment on October 16, 2006.

The facts are undisputed that, in the fall of 2004, after several years of physical and psychological health problems, Plaintiff sought acute medical services from River Oaks Hospital in New Orleans ("the Hospital"). *See generally* Plaintiff's Admission Record (Admin. Rec. at

1

pp. 5-22). Plaintiff, diagnosed with bulimia nervosa, suffered from bouts of profound depression, a long history of restricting food, bingeing and purging, and an inability to maintain her health and proper nutrition independently. *See generally* Plaintiff's Medical Record, Administrative Record (Admin. Rec. at pp. 318-546).[1] Due to the severity of Plaintiff's illness, her three doctors recommended inpatient and partial hospitalization care. *See id.* Following the Hospital's services for inpatient treatment, she was followed on an intensive outpatient basis under the same diagnosis of bulimia nervosa and without being re-admitted to the Hospital. *See id.*

Plaintiff submitted to MAMSI timely and sufficient claims for coverage for medical treatment from October 13, 2004, to November 22, 2004. *See* November 9, 2004 River Oaks Hospital Request for Coverage letter (Admin. Rec. at p. 4). Defendant MAMSI denied Plaintiff's claim, citing two separate rationales. It denied a claim for coverage for Plaintiff's inpatient services from October 13, 2004 to November 8, 2004 on the ground that the treatment was not Medically Necessary. *See* October 14, 2004 MAMSI Denial of Coverage Letter (Admin. Rec. at p. 1). Defendant also denied Plaintiff's claim for coverage for her subsequent partial hospitalization services on the ground that Plaintiff had not obtained Preadmission Authorization. *See id.*

Plaintiff contends that MAMSI's original denial of benefits was flawed by a failure to consider Plaintiff's medical history and obvious need for inpatient treatment as attested to by her three physicians. The subsequent reviews by MAMSI perpetuate this blind eye to Plaintiff's presenting condition and the view of her own physicians. The Re-reviewers did not even consider the portion of the record which the Court ordered MAMSI to consider. *See*

---

[1] For ease of reference, the Administrative Record (Bates Labeled 0000001-00000796) has been abbreviated to "Admin. Rec." and the particular pin-point citations are identified without the series of proceeding zeroes.

Administrative Record, Tab 26, J. Michael Hannon Letter to IPRO of May 20, 2005, with attached medical records (Admin. Rec. pp. 553-741). Inpatient treatment was clearly required under the Contract's definition of "medically necessary" treatment.

Plaintiff also contends that MAMSI used a "Level of Care Criteria for Eating Disorder" that it was not entitled to adopt as a definition of "medically necessary" treatment under the contract. The MAMSI "Level of Care Criteria" is not a part of the Contract of insurance and MAMSI's administrative function does not entitle it to adopt criteria for treatment that are not a part of the Contract. See J. Michael Hannon Letter to IPRO of May 20, 2005 (Admin. Rec. at pp. 553-55).

In any event, the MAMSI reviewers and MAMSI in its brief to this Court repeatedly misstate and manipulate this "Level of Care Criteria" to its own purpose in an attempt to justify denial of coverage on a retrospective basis. *See* J. Michael Hannon Letter to IPRO of May 20, 2005 (Admin Rec. at p. 554). Plaintiff maintains that even if MAMSI is entitled to adopt this extra-contractual "Level of Care Criteria", her condition meets that criteria and coverage should have been provided.

## FACTUAL BACKGROUND

Plaintiff is presenting the undisputed facts here in two parts. The first contains a statement of facts which largely involves Plaintiff's medical condition prior to her inpatient admission to River Oaks. That is because MAMSI says nothing about this time in Plaintiff's medical history.

The second section contains Plaintiff's Counterstatement of Material Facts in response and opposition to MAMSI's Motion for Summary Judgment. Plaintiff hopes that this presentation presents a clear chronological report of her care.

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

1. Plaintiff was born in Washington, D.C. and is the younger of two siblings. Her parents are divorced and Plaintiff has primarily lived with her father since the divorce. Early in her life, Plaintiff exhibited symptoms of depression and has been in psychiatric therapy intermittently since the age of five. *See* October 13, 2004 River Oaks Hospital Psychological Evaluation (Admin. Rec. at p. 14).

2. Plaintiff was isolated and anxious throughout adolescence and practiced self-mutilation in the form of "cutting" in high school. *See* Tripitelli Progress Reports (Admin. Rec. at pp. 580-82). She endured decreased self-esteem and self worth throughout her formative years. *See* October 13, 2004 River Oaks Admission Summary (Admin. Rec. at p. 10).

3. Plaintiff's first adult psychiatric treatment began in Washington, D.C., in April, 2004 with Rick Henderson, M.D. She reported feeling uncomfortable after eating meals and began vomiting to provide relief for her discomfort. *See* October 13, 2004 Admission Summary (Admin. Rec. at p.318). Plaintiff launched a pattern of overeating and purging, which subsequently led to bingeing behaviors. *See id.* Plaintiff reported bingeing and purging 14 times per week at worst. *See* October 13, 2004 River Oaks Hospital Psychological Evaluation (Admin. Rec. at p. 17). Dr. Henderson prescribed Prozac to control Plaintiff's eating disorder behaviors and depression, which Plaintiff summarily discontinued. She was non-compliant in taking anti-depressant medication.

4. Plaintiff then began treatment with Dr. Carol Lynn Tripitelli, M.D., also in Washington, D.C., on July 10, 2004. Because Plaintiff continued to suffer from depression and eating disorder behaviors, Dr. Tripitelli encouraged Plaintiff to enter an inpatient treatment center. *See* Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 583). At this

point, Plaintiff engaged in bingeing and purging up to four times per day, anytime any food or drink was consumed. *See id* (Admin. Rec. at pp. 580-82). Plaintiff, however, resisted inpatient treatment, admitting that part of her did not "want to give up the eating disorder." *See id* (Admin. Rec. at p. 587). Dr. Tripitelli re-prescribed Prozac.

5. On July 12, 2004, Plaintiff reported to Dr. Tripitelli feeling tired and crying a lot. *See id* (Admin. Rec. at p. 586-87). Dr. Tripitelli discussed the benefits and structure of inpatient treatment, but Plaintiff continued to resist. *See id.* Dr. Tripitelli continued Plaintiff's prescription of Prozac. *See id.*

6. On July 28, 2004, Plaintiff reported problems associated with having unstructured time. *See id.* Dr. Tripitelli further discussed inpatient or day hospitalization treatment with Plaintiff. *See id.* Plaintiff continued to be resistant, but acknowledged that her distorted body image is a result of her eating disorder. *See id*.

7. Plaintiff continued to restrict her diet and engage in eating disorder behaviors. On August 4, 2004, Plaintiff reported to Dr. Tripitelli that she was eating only once per day and purging once per day. *See id.* (Admin. Rec. at p. 590). Plaintiff further reported fearing breakfast, knowing that eating in the morning could trigger bingeing throughout the day. *See id* (Admin. Rec. at p. 588). Dr. Tripitelli again recommended inpatient hospitalization, followed by partial inpatient treatment for her eating disorder. *See id.* Plaintiff, however, remained resistant.

8. Plaintiff continued treatment with Dr. Tripitelli on August 9, 2004. Dr. Tripitelli further emphasized her primary recommendation of inpatient hospitalization followed by day hospitalization treatment for Plaintiff's eating disorder. Plaintiff continued to be resistant and, scheduled to begin classes on August 23, 2004, left for Tulane University.

5

9. Plaintiff continued to suffer throughout early fall of 2004. She refused to eat, continued to lose weight, resisted medication, and partook in out of control bingeing and purging. Plaintiff's psychological history evaluation reports that Plaintiff:

> [A]lways becomes anxious prior to eating. She is always terrified abut being overweight. She always avoids eating when she is hungry. She always finds herself preoccupied with food. She always is aware of the calorie content of foods that she eats…She very often vomits after she has eaten. She always likes her stomach to be empty.

*See* generally October 13, 2004 Psychological Evaluation (Admin. Rec. at p. 19).

10. The Psychological evaluation further indicated that though suicidal ideation is denied, Plaintiff's profile is consistent with suicidal thoughts. *See id.* At times, Plaintiff reports a strong urge to do "something shocking and harmful." *See id.*

11. During this period, Plaintiff reported feeling listless and engaging in bingeing and purging activities. *See id.* Suffering and feeling unable to control her eating disorder, Plaintiff saw Jean Tolmas, M.D., of the Tulane University Medical Center. *See* September 1, 2004 Tulane University SHC Cardiology Department Report (Admin. Rec. at p. 698).

12. Plaintiff was suspected of having suffered a silent heart attack in early September. *See id.* Pursuant to the cardiology report, Plaintiff suffered a possible Anterior Infarct. *See* September 3, 2004 Consultation Request (Admin. Rec. at p. 719). Dr. Tolmas was Plaintiff's referring practitioner. *See id.*

13. Dr. Tolmas was of the opinion that Plaintiff required inpatient treatment and contacted Susan Willard of River Oaks Hospital, a private psychiatric facility specializing in the treatment of acute psychiatric illness, compulsive behaviors, and eating disorders. Plaintiff then began outpatient treatment at River Oaks with Mary Stock, L.C.M., and Corey Walsh, R.D.

6

14. At River Oaks, Mary Stock treated Plaintiff as an outpatient a few weeks prior to Plaintiff's inpatient admission. *See* Admin. Rec. at p. 556. Ms. Stock was in contact with Carol Lynn Tripitelli M.D., from Washington, D.C., Jean Tolmas, M.D., from Tulane University Health Center, as well as Plaintiff's nutritionist, Corey Walsh. Each professional expressed concern regarding the Plaintiff's continued weight loss and nausea. *See id.* Ms. Stock informed Drs. Tripitelli and Tolmas that Plaintiff's health was not improving, that she was unsuccessful in gaining weight, and that she continued to engage in eating disorder behaviors, including bingeing and purging. Dr. Tolmas was particularly concerned about Plaintiff's abnormal EKG, taken prior to Plaintiff's outpatient care. *See* September 1, 2004 Tulane University SHC Cardiology Department Report (Admin. Rec. at p. 698).

15. Plaintiff's medical examination indicates a continued struggle with anxiety and a history of panic attacks. *See* Admission Summary (Admin. Rec. at p. 316). Plaintiff further revealed a history of enduring mood swings, reportedly feeling victim to extreme sadness and irritability. *See id.* (Admin. Rec. at p. 316). During this time, Plaintiff continued to be non-compliant with her anti-depressant prescription and continued eating disorder behaviors. Plaintiff had therefore proven that she was incapable of successfully managing her eating disorder in an outpatient capacity.

16. Ms. Stock, in conjunction with all of Plaintiff's treating physicians, agreed that inpatient care was the best option for successful treatment. Plaintiff was admitted to River Oaks Hospital ("the Hospital") in New Orleans, Louisiana on October 13, 2004 and was subsequently diagnosed with bulimia nervosa. *See id.* (Admin. Rec. at p. 318). Mary Stock stated that Plaintiff required the structure, strict medication and supervision of the inpatient program. *See generally* May 20, 2005 Letter to IPRO (Admin. Rec. at pp 553-58). Ms. Stock further stated it

7

was medically necessary for Plaintiff to be placed in inpatient treatment due to her well-documented inability to conform her behavior to the treatment protocol and her complicating psychological issues. *See* Admission Summary (Admin. Rec. at p. 318).

17. At admission, Plaintiff reported feelings of ambivalence regarding hope for her future. *See id.* The Medical Record and progress notes state that Plaintiff continued to express feelings of depression, pain, frustration, anger and sadness. *See* November 9, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 609). Plaintiff further confessed having what she described as a horrendous body image and qualified certain days as "bad body image days." *See id.*

18. Plaintiff responded to the structure and care provided by River Oaks Hospital. At River Oaks, Plaintiff's treatment protocol included monitoring post meal reactions and emotions, and a pre-prepared diet used to teach normalized diet habits and the feeling of fullness. *See* October 13, 2004 River Oaks Hospital Admission Summary (Admin. Rec. at p. 10). Treatment also included individual and family therapy as well as medication recommendations. *See id.*

19. The structure of meals and focus on counseling of inpatient treatment was difficult for Plaintiff. Plaintiff became agitated during meals when she believed that her nutritionist was changing her menu, adding foods Plaintiff would normally not consume. *See* November 9, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 609). For instance, Plaintiff refused to eat bread. *See id.* In addition to resisting nutritional treatment, Plaintiff was sometimes resistant to inpatient treatment generally, claiming that she was only at River Oaks because her father wanted her to be. *See id.* The treatment team often discussed Plaintiff's ambivalence toward treatment, reporting that Plaintiff had difficult, angry and tearful individual and family sessions, as well as a great deal of difficulty coping with the reality of

8

committing to treatment. *See* November 12, 2004 River Oaks Hospital Physician Progress Note (Admin. Rec. at p. 13).

20. In continuing her treatment, Plaintiff was placed in a partial hospitalization program on November 9, 2004, following her inpatient care. The partial hospitalization services that were provided were a continuation of Plaintiff's inpatient care and began immediately following her inpatient treatment. *See generally* Plaintiff's Admission Record (Admin. Rec. at pp. 5-22); See May 20, 2005, J. Michael Hannon Letter (Admin Rec. at pp. 557-58).

21. Again, though necessary, partial hospitalization was difficult for Plaintiff. Plaintiff reported feeling "unsuccessful, overwhelmed, scared and guilty." *See* November 9, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 19). Plaintiff's frustrated, nervous and guilty affect was persistent through treatment. *See id.*

22. She was prescribed Lexapro, another anti-depressant, and was discharged from the Hospital to follow with Mary Stock

23. Plaintiff continued treatment with Dr. Tripitelli upon her discharge from River Oaks Hospital. At River Oaks, Plaintiff admitted to inconsistent administration of her Prozac prescription. *See* October 26, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 134). Based on this non-compliance, Plaintiff was prescribed Lexapro. *See id.* On December 16, 2004, however, Plaintiff reported to Dr. Tripitelli that she no longer had the prescription. *See* December 16, 2004 Carol Lynn Tripitelli Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 592-93); December 22, 2004 Carol Lynn Tripitelli Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 594); January 6, 2005 Carol Lynn Tripitelli Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 596). Plaintiff further

reported struggling with eating disorder behaviors since being discharged from River Oaks. *See id.*

24. In the telephone hearing conducted by IPRO on May 19, 2005, Mary Stock spoke to the IPRO representative and its anonymous physician. Mary Stock's comments are reported in the letter of the next day to IPRO. See May 20, 2005, J. Michael Hannon Letter (Admin. Rec. at pp. 553-558). None of Mary Stock's comments are addressed by the MAMSI reviewers.

25. Also contained in the May 20, 2005, J. Michael Hannon Letter to IPRO was the following demand:

> We have obtained and included the billing records from River Oaks. Even if MAMSI took the position that inpatient care would not be covered, the treatment modalities applied during that time period were clearly covered mental health services. For MAMSI to fail to consider covering all services except for the daily bed rate is evidence of its bad faith. In any event, all of the expenses should have been covered by MAMSI from the outset.

(Admin. Rec. at p. 558). The billing records were attached to the letter and are contained at pages 721-737 of the Administrative Record. MAMSI never responded to this demand that the non-hospital charges be paid under its Contract of insurance.

## COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Many of the operative facts in this case are not in dispute. However, Defendant's Statement of Undisputed Facts draws unwarranted inferences as to its rights under the Contract of insurance, ignores material evidence of Plaintiff's condition, mischaracterizes its "Level of Care Criteria", and overstates the conclusions of its reviewers. For ease of reference, the following numbered paragraphs parallel and respond to Defendant's Statement of Undisputed Material Facts.

A. **The ERISA Health Benefits Plan at Issue**

3.      During the period relevant to the issues in dispute, MAMSI acted as the administrator of the Contract. MAMSI argues that it was given broad discretion to interpret and administer the terms of the Contract. For that proposition, Defendant cites Article 9.3 of the Contract, in a section entitled "Miscellaneous", that provides that MAMSI shall:

> [A]dopt reasonable policies, procedures, rules and interpretations to promote orderly and efficient administration of [the] Contract, and the Employer agrees to cooperate with MLH in administering such rules and regulations

*See* Group Agreement, Article 9.3 (Admin. Rec. at pp. 217-301). The Group Policy requires MAMSI, the administrator, to provide coverage to a beneficiary when the group enrollee satisfies the terms and requirements set forth in the Contract. Inpatient treatment for bulimia is warranted under the Contract if it is "medically necessary" as that term is defined in the Contract. *See* Group Certificate, Definition of Medical Necessity (Admin. Rec. at p. 279).

Article 9.3 of the Contract does not give MAMSI discretion to add coverage criteria to the Contract of which Plaintiff was unaware and had no notice. MAMSI relies on its use of the MAMSI Behavioral Health and Psychiatric Level of Care Criteria for Eating Disorders ("Criteria") (Admin. Rec. at pp 303-305) to deny coverage. However, that protocol is not a part of the Contract. Article 9.3 does not authorize MAMSI to create new criteria for treatment, since the term "medically necessary" is fully defined in the policy.

4.      Plaintiff was admitted to River Oaks Hospital ("the Hospital") in New Orleans, Louisiana on October 13, 2004. Plaintiff was indeed diagnosed with bulimia nervosa as MAMSI accurately states. Plaintiff, however, was admitted because of her long history of "restricting, and purging behaviors, which she [was] unable to cease, despite *outpatient* treatment with Corey Walsh, [a] Registered Nutritionist, individual therapy with Mary Stock, LCSW, and prior treatment [at] her home in Washington, [D.C.]. At the time, Plaintiff complained that she was

11

unable to stop and purging." *See* Administrative Record ("Admin. Rec.") at p. 318. The full record of Plaintiff's health status prior to admission is contained in the Statement of Material Facts above, which is incorporated herein by reference.

5.      Defendant's statement that the Plaintiff's admitting physical exam, laboratory workup, and vital signs were normal is accurate. Defendant mischaracterizes the importance of Plaintiff's weight during her treatment, as Plaintiff had had difficulties maintaining her weight before admission. *See* Plaintiff's Statement of Material Facts above. Moreover, weight fluctuation is not a conclusive criteria even under MAMSI's extra-contractual Level of Care Criteria. *See* CSMF 7 and 9, below.

6.      MAMSI claims that the Medical Record makes clear that Plaintiff did not express suicidal ideations during inpatient treatment. MAMSI SMF at ¶ 6. First, this claim is irrelevant as "suicidal ideation" is not part of the definition of "medically necessary" and is not even a part of the extra-contractual MAMSI "Level of Care Criteria." The Medical Record and progress notes state that Plaintiff expressed feeling "depressed, pained, frustrated, angry and sad." Plaintiff further confessed having what she described as a horrendous body image and qualified certain days as "bad body image days." *See* November 9, 2004 River Oaks Hospital Partial Progress Notes ("Progress Notes") (Admin. Rec. at p. 609). Her admitting physician, George Daul, Jr., M.D., noted Plaintiff's ambivalence toward treatment and her "need to remain sick in a family system" where "being sick earns nurturing from her family members." *See* November 9, 2004 Progress Notes (Admin. Rec. at p. 613). Plaintiff's history and psychological examination indicate a struggle with anxiety and a history of panic attacks. *See* Admission Summary (Admin. Rec. at p. 16). Plaintiff further revealed a history of enduring mood swings, reportedly feeling victim to extreme sadness and irritability. *See id.* Furthermore, the Plaintiff practiced physical

mutilation during high school, in the form of "cutting" and has periodically been prescribed anti-depressant medication without success. *See id.* Finally, though suicidal ideation was denied by the Plaintiff when asked by the examining physician, the Plaintiff reported feelings of ambivalence regarding hope for her future. *See id.*

### C. MAMSI's Initial Denial of Coverage

7. MAMSI claims that it utilized its "criteria for determining medical necessity of an inpatient stay" to deny coverage. MAMSI SMF ¶ 7. This is incorrect. The Contract at issue supplies a definition for what qualifies as Medically Necessary. MAMSI did not however, apply this definition to Plaintiff's claim, but rather referred to Criteria not found in the Contract. Furthermore, MAMSI and its reviewers repeatedly misstate its own Criteria used to reach its decision on Plaintiff's claim and have presented no evidence that any of the medical experts received the correct Criteria to form their opinions. In its Statement of Undisputed Material Facts 7, MAMSI incorrectly describes its own Criteria. MAMSI states that the Criteria requires "a finding of at least one of the following criteria:"

   a. severe weight loss: i.e., refusal to maintain weight at or above 75% of optimal weight;

   b. medical complications related to weight loss that require 24-hour skilled nursing care such as a heart rate less than 40, blood pressure less than 90/60, temperature less than 97, severe orthostatic changes, severe hypokalemia or hyponatremia, esophageal rupture, or other significantly abnormal test results;

   c. comorbid biomedical issues such as diabetes or pregnancy that worsen due to the weight loss and need 24-hour skilled nursing care; or

   d. comorbid psychiatric/substance abuse issues that meet inpatient rehabilitation criteria.

*See* MAMSI Statement of Undisputed Facts at 4.

13

If the Court determines that the Criteria can be properly considered in Plaintiff's claim, they accurately read as follows:

Admission Criteria are met if any one of 2-4, or 1 and any of 5-8 are met

1. Through determined food avoidance in the absence of any physical or mental illness, a refusal to maintain weight = or 75% of optimal body weight or approaching a weight at which physiological instability occurred in the past. For child/adult, may also be refusal to maintain bmi . 15 or body weight , 85% of optimal body weight during a period of rapid growth. *There are no particular weight indicators re: bulimia nervosa.*

2. Medical complications related to eating disorder that require 24 hour skilled nursing care.

3. Diabetes, pregnancy, cardiovascular disease, or any chronic medical illness that is worsening due to the patient's inability to manage eating disorder symptoms. Severity requires 24 hour monitoring by skilled nursing team.

4. Psychiatric issues that meet inpatient acute psychiatric criteria.

5. Resistant to acceptance of illness and treatment recommendations, or *verbally agrees to participate, but requires 24 hour skilled nursing supervision to resist urges to engage in eating disorder behaviors*

6. *Inability or unwillingness to comply with refeeding program and restricted exercise without 24 hour skilled nursing supervision* due to severe cognitive distortions, intensive fears, denial of serious illness

7. *Family conflicts/dysfunction contributes to the perpetuation of the eating disorder due to family's lack of insight, knowledge, coping skills. Patient is isolated from peers and community resources due to illness.*

8. *At a lower level of care, demonstrated inability to reverse weight loss or sustain weight gain, even with some supervision. Inability to control compulsive behaviors including exercise, and binge/purge cycle, even with some supervision. Non-compliant with treatment.*

*See* Eating Disorder Care Criteria (Admin. Rec. at pp. 303-05)(emphasis supplied).

MAMSI also claims that the Eating Disorder Care Criteria "incorporates the Group Certificate definition of Medical Necessity." *See* MAMSI Statement of Undisputed Facts at 4. It

14

does not. There is no evidence that indicates that the Criteria incorporate the definition of Medical Necessity, nor any evidence that they comport with recognized medical standards.

8.      Morton Albert, M.D., purported to apply the MAMSI "Level of Care Criteria" to conclude that Plaintiff's condition failed to meet the Criteria for inpatient treatment. His summary of the MAMSI criteria is inaccurate. In any event, Plaintiff met the criteria as stated by Dr. Albert due to her inability to manage the eating disorder and comorbid psychiatric issues identified by her treating physicians at admission.

9.      Furthermore, Dr. Albert misapplied the Criteria in denying coverage. Dr. Albert's denial focuses on Plaintiff's "normal height and weight," and "normal lab values." Nothing in the Criteria suggests that an enrollee with normal lab values will be summarily denied coverage. Level of Care Criteria (Admin. Rec. at pp. 303-305). Plaintiff's height, weight and lab values are not relevant to the Criteria cited. Dr. Albert notes no suicidal ideations or substance abuse issues, but those are not exclusive criteria even under the MAMSI Level of Care Criteria. Finally, even if the Criteria were applied accurately, MAMSI provides no evidence that Dr. Albert accepts the Criteria as determinative of medical necessity. In any event, Plaintiff's history of weight fluctuation was amply evidenced in the records of her pre-Admission treatment, all of which the MAMSI reviewers ignored. *See* Plaintiff's Statement of Material Facts, above.

### D.      The MAMSI Appeal Process

11.     MAMSI claims that an independent consulting case reviewer, Sheldon Glass, M.D., determined that Plaintiff failed to meet the inpatient Criteria. The Criteria that were used to reach this determination, however, are not provided.

12.     MAMSI's senior medical director, Vera Dvorak, M.D., based, in part on Sheldon Glass' determination, upheld MAMSI's decision. Defendant states that Plaintiff displayed no

"significant comorbid psychiatric issues requiring 24 hour skilled nursing assessment." Again, Dr. Dvorak misapplied the Criteria in reaching her decision. Moreover, the Criteria, even misapplied, do not require that Plaintiff display *significant* comorbid psychiatric issues. Dr. Dvorak further stated that Plaintiff was an "inpatient for 13 days before an antidepressant was prescribed." This information is not required to satisfy the Criteria, nor does it offer any evidence that Plaintiff did not suffer from mental illness. It also ignores the fact that Plaintiff was treated with antidepressants unsuccessfully on several occasions by her own physicians before admission to River Oaks, and that she was noncompliant with the treatment regimen. See Plaintiff's Statement of Material Facts 3, 4, 6, 14, and 15, above. That she was prescribed an antidepressant after sufficient evaluation indicates the seriousness of her illness.

  **E.**  **The MAMSI Anonymous Review After Complaint**

  13.  The Court should give no credence to the analysis and determinations of anonymous reviewers. Defendant provides no authority for why these reviewers must remain anonymous, and the Court should therefore not accept opinions of individuals who cannot be vouched for by name or credentials. In any event, the opinions of these reviewers are entitled to no weight as they were instructed to ignore the additional medical evidence and statements of Plaintiff's Clinical Social Worker, Mary Stock, presented in a telephone conference and subsequently submitted to IPBRO. *See* MAMSI Statement of Undisputed Material Facts at 8 and fn. 4.

  18.  Anonymous Reviewer-1 claims that Plaintiff first should have been treated with anti-depressant medication on an outpatient basis. This ignores the fact that Plaintiff was treated with an anti-depressants on an outpatient basis and was not compliant with the prescription. Moreover, Reviewer-1 reaches the same conclusion regarding Plaintiff's mental health as

16

Plaintiff's treatment team, stating that Plaintiff "clearly [had] elements of depression," and that her "family history [was] loaded with antidepressant responsive syndromes." *See* MAMSI SMF ¶ 18 at 9.

19.     Anonymous Reviewer-2 states only that Plaintiff fails to meet Defendant's Criteria. Again, Defendant provides no evidence that Anonymous Reviewer-2 was provided with a complete and accurate record of the appropriate Criteria. Nor does the Review contend that the criteria equate with "medical necessity."

20.     MAMSI accepted IPRO's recommendation despite being advised by Plaintiff's counsel that IPRO had chosen to ignore the substantial medical evidence provided during and after the telephone conference.

### F.     The Second Review by IPRO

23.     Re-reviewer-1, states that Plaintiff was not suffering "severe weight loss," "severe medical complications," or "severe co morbid conditions." MAMSI SMF ¶ 23 at 10. The Criteria, however, do not require Plaintiff's weight loss, medical health or condition to be "severe." *See* Criteria (Admin. Rec. at pp. 303-05). Nor do the Criteria require that one be "acutely psychotic." Nonetheless Re-reviewer-1 also agrees with Plaintiff's treatment team and further confirms that Plaintiff was "suffering [from] an eating disorder and a personality disorder." The Re-reviewer, now allegedly presented with all of Plaintiff's medical records which the Court ordered be included in the review, ignores them. There is not a single word about Plaintiff's prior medical history, weight struggles, efforts at outpatient treatment, efforts at medication and the River Oaks outpatient treatment that preceded her admission. *See* May 20, 2005, J. Michael Hannon Letter at pp. 553-58).

17

24.    Re-reviewer-2 stated that the inpatient admission was not justified because there were outpatient programs available. MAMSI SMF ¶24 at 11. This anonymous reviewer provides no evidence as to the availability of such programs in New Orleans. The only evidence on this point was that there were no comprehensive outpatient programs in New Orleans that provided the care that Plaintiff required. There is one other outpatient program but it does not promote weight gain, monitor meals, or provide the structure Plaintiff required. Admin. Rec. at pp.553-58. Simply put, the River Oaks inpatient program was the only choice available. The Re-reviewer, now allegedly presented with all of Plaintiff's medical records which the Court ordered be included in the review, ignores them. There is not a single word about Plaintiff's prior medical history, weight struggles, efforts at outpatient treatment, efforts at medication and the River Oaks outpatient treatment that preceded her admission. *See* May 20, 2005, J. Michael Hannon Letter at pp. 557).

    **G.    MAMSI's Segregation of Plaintiff's Claim for Partial Hospitalization**

27.    MAMSI claims that Plaintiff failed to seek or receive pre-certification from MAMSI prior to her subsequent partial hospitalization. Plaintiff contends that the inpatient care and partial hospitalization are both part of one continuing course of treatment for bulimia nervosa. This was noted to the District of Columbia during the course of their review, and the pre-certification denial letter was a part of the initial appeal. *See* March 24, 2005, J. Michael Hannon Letter at p. 739).

28.    MAMSI claims that Plaintiff did not exhaust her administrative remedies and is therefore unable to submit a request for coverage for partial hospitalization. However, MAMSI did fully consider Plaintiff's claim as to partial hospitalization on a full record. Thus, the purpose of exhaustion of administrative remedies has been met, and MAMSI is precluded from

claiming that Plaintiff is prohibited from requesting coverage. Plaintiff has sufficiently exercised her administrative remedies.

Even if the Court, however, determines that the Partial Hospitalization was indeed separate treatment, Plaintiff was still not required to obtain Pre-certification. The Contract requires Preadmission Authorization only for Hospital Confinement. *See* Group Certificate (Admin. Rec. at p. 276). The Contract defines Hospital Confinement as "being registered as a bed patient in a Hospital." *See* Group Certificate (Admin. Rec. at p. 276). Plaintiff was not registered as a bed patient during the time that the Hospital provided her with partial hospitalization services and was therefore not required to receive preadmission authorization in order for her treatment to be covered.

<div style="margin-left: 50%;">

Respectfully submitted,

HANNON LAW GROUP, LLP

___//s// J. Michael Hannon //s//___
J. Michael Hannon, #352526
1901 18th Street, NW
Washington, DC 20009
(202) 232-1907
Fax: (202) 232-3704
*Counsel for Plaintiff Jane Doe*

</div>