## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANE DOE,                                    :

    Plaintiff,                           :
                              CASE NO. 1:05cv02450 (ESH)
    v.                                   :

MAMSI LIFE AND HEALTH                        :
INSURANCE COMPANY, et al.,
                                         :

    Defendants.

## PLAINTIFF'S MEMORANDUM
## OF POINTS AND AUTHORITIES IN SUPPORT
## OF HER CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
## <u>OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Jane Doe, through her attorneys, HANNON LAW GROUP, LLP, respectfully submits the following Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of her Cross-Motion for Summary Judgment.

### <u>INTRODUCTION</u>

Plaintiff seeks health benefits coverage for covered services under an employer-sponsored health benefits plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. The requested benefits have been denied by the Defendant, MAMSI Life and Health Insurance Company ("MAMSI"), which moved for Summary Judgment on October 16, 2006.

The facts are undisputed that, in the fall of 2004, after several years of physical and psychological health problems, Plaintiff sought acute medical services from River Oaks Hospital in New Orleans ("the Hospital"). *See generally* Plaintiff's Admission Record (Admin. Rec. at pp. 5-22). Plaintiff, diagnosed with bulimia nervosa, suffered

from bouts of profound depression, a long history of restricting food, bingeing and purging, and an inability to maintain her health and proper nutrition independently. *See generally* Plaintiff's Medical Record, Administrative Record (Admin. Rec. at pp. 318-546).[1] Due to the severity of Plaintiff's illness, her three doctors recommended inpatient and partial hospitalization care. *See id.* Following the Hospital's services for inpatient treatment, she was followed on an intensive outpatient basis under the same diagnosis of bulimia nervosa and without being re-admitted to the Hospital. *See id.*

Plaintiff submitted to MAMSI timely and sufficient claims for coverage for medical treatment from October 13, 2004, to November 22, 2004. *See* November 9, 2004 River Oaks Hospital Request for Coverage letter (Admin. Rec. at p. 4). Defendant MAMSI denied Plaintiff's claim, citing two separate rationales. It denied a claim for coverage for Plaintiff's inpatient services from October 13, 2004 to November 8, 2004 on the ground that the treatment was not Medically Necessary. *See* October 14, 2004 MAMSI Denial of Coverage Letter (Admin. Rec. at p. 1). Defendant also denied Plaintiff's claim for coverage for her subsequent partial hospitalization services on the ground that Plaintiff had not obtained Preadmission Authorization. *See id.*

Plaintiff contends that MAMSI's original denial of benefits was flawed by a failure to consider Plaintiff's medical history and obvious need for inpatient treatment as attested to by her three physicians. The subsequent reviews by MAMSI perpetuate this blind eye to Plaintiff's presenting condition and the view of her own physicians. The Re-reviewers did not even consider the portion of the record which the Court ordered MAMSI to consider. *See* Administrative Record, Tab 26, J. Michael Hannon Letter to

---

[1]    For ease of reference, the Administrative Record (Bates Labeled 0000001-00000796) has been abbreviated to "Admin. Rec." and the particular pin-point citations are identified without the series of proceeding zeroes.

IPRO of May 20, 2005, with attached medical records (Admin. Rec. pp. 553-741).

Inpatient treatment was clearly required under the Contract's definition of "medically

necessary" treatment.

Plaintiff also contends that MAMSI used a "Level of Care Criteria for Eating

Disorder" that it was not entitled to adopt as a definition of "medically necessary"

treatment under the contract.  The MAMSI "Level of Care Criteria" is not a part of the

Contract of insurance and MAMSI's administrative function does not entitle it to adopt

criteria for treatment that are not a part of the Contract.  See J. Michael Hannon Letter to

IPRO of May 20, 2005 (Admin. Rec. at pp. 553-55).

In any event, the MAMSI reviewers and MAMSI in its brief to this Court

repeatedly misstate and manipulate this "Level of Care Criteria" to its own purpose in an

attempt to justify denial of coverage on a retrospective basis.  *See* J. Michael Hannon

Letter to IPRO of May 20, 2005 (Admin Rec. at p. 554).  Plaintiff maintains that even if

MAMSI is entitled to adopt this extra-contractual "Level of Care Criteria", her condition

meets that criteria and coverage should have been provided.

## FACTUAL BACKGROUND

Plaintiff is presenting the undisputed facts here in two parts.  The first contains a

statement of facts which largely involves Plaintiff's medical condition prior to her

inpatient admission to River Oaks.  That is because MAMSI says nothing about this time

in Plaintiff's medical history.

The second section contains Plaintiff's Counterstatement of Material Facts in

response and opposition to MAMSI's Motion for Summary Judgment.  Plaintiff hopes

that this presentation presents a clear chronological report of her care.

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

1.      Plaintiff was born in Washington, D.C. and is the younger of two siblings.
Her parents are divorced and Plaintiff has primarily lived with her father since the
divorce.  Early in her life, Plaintiff exhibited symptoms of depression and has been in
psychiatric therapy intermittently since the age of five.  *See* October 13, 2004 River Oaks
Hospital Psychological Evaluation (Admin. Rec. at p. 14).

2.      Plaintiff was isolated and anxious throughout adolescence and practiced
self-mutilation in the form of "cutting" in high school.  *See* Tripitelli Progress Reports
(Admin. Rec. at pp. 580-82).  She endured decreased self-esteem and self worth
throughout her formative years.  *See* October 13, 2004 River Oaks Admission Summary
(Admin. Rec. at p. 10).

3.      Plaintiff's first adult psychiatric treatment began in Washington, D.C., in
April, 2004 with Rick Henderson, M.D.  She reported feeling uncomfortable after eating
meals and began vomiting to provide relief for her discomfort.  *See* October 13, 2004
Admission Summary (Admin. Rec. at p.318).  Plaintiff launched a pattern of overeating
and purging, which subsequently led to bingeing behaviors.  *See id*.  Plaintiff reported
bingeing and purging 14 times per week at worst.  *See* October 13, 2004 River Oaks
Hospital Psychological Evaluation (Admin. Rec. at p. 17).  Dr. Henderson prescribed
Prozac to control Plaintiff's eating disorder behaviors and depression, which Plaintiff
summarily discontinued.  She was non-compliant in taking anti-depressant medication.

4.      Plaintiff then began treatment with Dr. Carol Lynn Tripitelli, M.D., also in
Washington, D.C., on July 10, 2004.  Because Plaintiff continued to suffer from
depression and eating disorder behaviors, Dr. Tripitelli encouraged Plaintiff to enter an

inpatient treatment center.  *See* Continuous Treatment Outpatient Progress Note (Admin. Rec. at. p. 583).  At this point, Plaintiff engaged in bingeing and purging up to four times per day, anytime any food or drink was consumed.  *See id* (Admin. Rec. at pp. 580-82).  Plaintiff, however, resisted inpatient treatment, admitting that part of her did not "want to give up the eating disorder."  *See id* (Admin. Rec. at p. 587).  Dr. Tripitelli re-prescribed Prozac.

5.    On July 12, 2004, Plaintiff reported to Dr. Tripitelli feeling tired and crying a lot.  *See id* (Admin. Rec. at p. 586-87).  Dr. Tripitelli discussed the benefits and structure of inpatient treatment, but Plaintiff continued to resist.  *See id.*  Dr. Tripitelli continued Plaintiff's prescription of Prozac.  *See id.*

6.    On July 28, 2004, Plaintiff reported problems associated with having unstructured time.  *See id.*  Dr. Tripitelli further discussed inpatient or day hospitalization treatment with Plaintiff.  *See id.*  Plaintiff continued to be resistant, but acknowledged that her distorted body image is a result of her eating disorder.  *See id.*

7.    Plaintiff continued to restrict her diet and engage in eating disorder behaviors.  On August 4, 2004, Plaintiff reported to Dr. Tripitelli that she was eating only once per day and purging once per day.  *See id.* (Admin. Rec. at p. 590).  Plaintiff further reported fearing breakfast, knowing that eating in the morning could trigger bingeing throughout the day.  *See id* (Admin. Rec. at p. 588).  Dr. Tripitelli again recommended inpatient hospitalization, followed by partial inpatient treatment for her eating disorder.  *See id.*  Plaintiff, however, remained resistant.

8.    Plaintiff continued treatment with Dr. Tripitelli on August 9, 2004.  Dr. Tripitelli further emphasized her primary recommendation of inpatient hospitalization

followed by day hospitalization treatment for Plaintiff's eating disorder.  Plaintiff

continued to be resistant and, scheduled to begin classes on August 23, 2004, left for

Tulane University.

9.      Plaintiff continued to suffer throughout early fall of 2004.  She refused to

eat, continued to lose weight, resisted medication, and partook in out of control bingeing

and purging.  Plaintiff's psychological history evaluation reports that Plaintiff:

> [A]lways becomes anxious prior to eating.  She is always terrified abut
> being overweight.  She always avoids eating when she is hungry.  She
> always finds herself preoccupied with food.  She always is aware of the
> calorie content of foods that she eats…She very often vomits after she has
> eaten.  She always likes her stomach to be empty.

*See* generally October 13, 2004 Psychological Evaluation (Admin. Rec. at p. 19).

10.      The Psychological evaluation further indicated that though suicidal

ideation is denied, Plaintiff's profile is consistent with suicidal thoughts.  *See id.*  At

times, Plaintiff reports a strong urge to do "something shocking and harmful." *See id*.

11.      During this period, Plaintiff reported feeling listless and engaging in

bingeing and purging activities.  *See id.*  Suffering and feeling unable to control her

eating disorder, Plaintiff saw Jean Tolmas, M.D., of the Tulane University Medical

Center.  *See* September 1, 2004 Tulane University SHC Cardiology Department Report

(Admin.  Rec. at p. 698).

12.      Plaintiff was suspected of having suffered a silent heart attack in early

September.  *See id.*  Pursuant to the cardiology report, Plaintiff suffered a possible

Anterior Infarct.  *See* September 3, 2004 Consultation Request (Admin. Rec. at p. 719).

Dr. Tolmas was Plaintiff's referring practitioner.  *See id.*

13. Dr. Tolmas was of the opinion that Plaintiff required inpatient treatment and contacted Susan Willard of River Oaks Hospital, a private psychiatric facility specializing in the treatment of acute psychiatric illness, compulsive behaviors, and eating disorders. Plaintiff then began outpatient treatment at River Oaks with Mary Stock, L.C.M., and Corey Walsh, R.D.

14. At River Oaks, Mary Stock treated Plaintiff as an outpatient a few weeks prior to Plaintiff's inpatient admission. *See* Admin. Rec. at p. 556. Ms. Stock was in contact with Carol Lynn Tripitelli M.D., from Washington, D.C., Jean Tolmas, M.D., from Tulane University Health Center, as well as Plaintiff's nutritionist, Corey Walsh. Each professional expressed concern regarding the Plaintiff's continued weight loss and nausea. *See id.* Ms. Stock informed Drs. Tripitelli and Tolmas that Plaintiff's health was not improving, that she was unsuccessful in gaining weight, and that she continued to engage in eating disorder behaviors, including bingeing and purging. Dr. Tolmas was particularly concerned about Plaintiff's abnormal EKG, taken prior to Plaintiff's outpatient care. *See* September 1, 2004 Tulane University SHC Cardiology Department Report (Admin. Rec. at p. 698).

15. Plaintiff's medical examination indicates a continued struggle with anxiety and a history of panic attacks. *See* Admission Summary (Admin. Rec. at p. 316). Plaintiff further revealed a history of enduring mood swings, reportedly feeling victim to extreme sadness and irritability. *See id.* (Admin. Rec. at p. 316). During this time, Plaintiff continued to be non-compliant with her anti-depressant prescription and continued eating disorder behaviors. Plaintiff had therefore proven that she was incapable of successfully managing her eating disorder in an outpatient capacity.

16.     Ms. Stock, in conjunction with all of Plaintiff's treating physicians, agreed that inpatient care was the best option for successful treatment.  Plaintiff was admitted to River Oaks Hospital ("the Hospital") in New Orleans, Louisiana on October 13, 2004 and was subsequently diagnosed with bulimia nervosa.  *See id.* (Admin. Rec. at p. 318). Mary Stock stated that Plaintiff required the structure, strict medication and supervision of the inpatient program.  *See generally* May 20, 2005 Letter to IPRO (Admin. Rec. at pp 553-58).  Ms. Stock further stated it was medically necessary for Plaintiff to be placed in inpatient treatment due to her well-documented inability to conform her behavior to the treatment protocol and her complicating psychological issues.  *See* Admission Summary (Admin. Rec. at p. 318).

17.     At admission, Plaintiff reported feelings of ambivalence regarding hope for her future.  *See id.*  The Medical Record and progress notes state that Plaintiff continued to express feelings of depression, pain, frustration, anger and sadness.  *See* November 9, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 609). Plaintiff further confessed having what she described as a horrendous body image and qualified certain days as "bad body image days."  *See id.*

18.     Plaintiff responded to the structure and care provided by River Oaks Hospital.  At River Oaks, Plaintiff's treatment protocol included monitoring post meal reactions and emotions, and a pre-prepared diet used to teach normalized diet habits and the feeling of fullness.  *See* October 13, 2004 River Oaks Hospital Admission Summary (Admin. Rec. at p. 10).  Treatment also included individual and family therapy as well as medication recommendations.  *See id*.

19.    The structure of meals and focus on counseling of inpatient treatment was difficult for Plaintiff.  Plaintiff became agitated during meals when she believed that her nutritionist was changing her menu, adding foods Plaintiff would normally not consume. *See* November 9, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 609).  For instance, Plaintiff refused to eat bread.  *See id.*  In addition to resisting nutritional treatment, Plaintiff was sometimes resistant to inpatient treatment generally, claiming that she was only at River Oaks because her father wanted her to be.  *See id.* The treatment team often discussed Plaintiff's ambivalence toward treatment, reporting that Plaintiff had difficult, angry and tearful individual and family sessions, as well as a great deal of difficulty coping with the reality of committing to treatment.  *See* November 12, 2004 River Oaks Hospital Physician Progress Note (Admin. Rec. at p. 13).

20.    In continuing her treatment, Plaintiff was placed in a partial hospitalization program on November 9, 2004, following her inpatient care.  The partial hospitalization services that were provided were a continuation of Plaintiff's inpatient care and began immediately following her inpatient treatment. *See generally* Plaintiff's Admission Record (Admin. Rec. at pp. 5-22); See May 20, 2005, J. Michael Hannon Letter (Admin Rec. at pp. 557-58).

21.    Again, though necessary, partial hospitalization was difficult for Plaintiff. Plaintiff reported feeling "unsuccessful, overwhelmed, scared and guilty."  *See* November 9, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 19). Plaintiff's frustrated, nervous and guilty affect was persistent through treatment.  *See id*.

22.    She was prescribed Lexapro, another anti-depressant, and was discharged from the Hospital to follow with Mary Stock

23.    Plaintiff continued treatment with Dr. Tripitelli upon her discharge from River Oaks Hospital.  At River Oaks, Plaintiff admitted to inconsistent administration of her Prozac prescription.  *See* October 26, 2004 River Oaks Hospital Partial Progress Notes (Admin. Rec. at p. 134).  Based on this non-compliance, Plaintiff was prescribed Lexapro.  *See id.*  On December 16, 2004, however, Plaintiff reported to Dr. Tripitelli that she no longer had the prescription.  *See* December 16, 2004 Carol Lynn Tripitelli Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 592-93);  December 22, 2004 Carol Lynn Tripitelli Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 594); January 6, 2005 Carol Lynn Tripitelli Continuous Treatment Outpatient Progress Note (Admin. Rec. at p. 596).  Plaintiff further reported struggling with eating disorder behaviors since being discharged from River Oaks.  *See id.*

24.    In the telephone hearing conducted by IPRO on May 19, 2005, Mary Stock spoke to the IPRO representative and its anonymous physician.  Mary Stock's comments are reported in the letter of the next day to IPRO.  See May 20, 2005, J. Michael Hannon Letter (Admin. Rec. at pp. 553-558).  None of Mary Stock's comments are addressed by the MAMSI reviewers.

25.    Also contained in the May 20, 2005, J. Michael Hannon Letter to IPRO was the following demand:

> We have obtained and included the billing records from River Oaks.  Even if MAMSI took the position that inpatient care would not be covered, the treatment modalities applied during that time period were clearly covered mental health services.  For MAMSI to fail to consider covering all services except for the daily bed rate is evidence of its bad faith.  In any event, all of the expenses should have been covered by MAMSI from the outset.

(Admin. Rec. at p. 558).  The billing records were attached to the letter and are contained

at pages 721-737 of the Administrative Record.  MAMSI never responded to this demand

that the non-hospital charges be paid under its Contract of insurance.

### COUNTERSTATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Many of the operative facts in this case are not in dispute.  However, Defendant's

Statement of Undisputed Facts draws unwarranted inferences as to its rights under the

Contract of insurance, ignores material evidence of Plaintiff's condition, mischaracterizes

its "Level of Care Criteria", and overstates the conclusions of its reviewers.  For ease of

reference, the following numbered paragraphs parallel and respond to Defendant's

Statement of Undisputed Material Facts.

### A.    The ERISA Health Benefits Plan at Issue

3.    During the period relevant to the issues in dispute, MAMSI acted as the

administrator of the Contract.  MAMSI argues that it was given broad discretion to

interpret and administer the terms of the Contract.  For that proposition, Defendant cites

Article 9.3 of the Contract, in a section entitled "Miscellaneous", that provides that

MAMSI shall:

> [A]dopt reasonable policies, procedures, rules and interpretations to promote
> orderly and efficient administration of [the] Contract, and the Employer agrees to
> cooperate with MLH in administering such rules and regulations

*See* Group Agreement, Article 9.3 (Admin. Rec. at pp. 217-301).  The Group Policy

requires MAMSI, the administrator, to provide coverage to a beneficiary when the group

enrollee satisfies the terms and requirements set forth in the Contract.  Inpatient treatment

for bulimia is warranted under the Contract if it is "medically necessary" as that term is

defined in the Contract. *See* Group Certificate, Definition of Medical Necessity (Admin. Rec. at p. 279).

Article 9.3 of the Contract does not give MAMSI discretion to add coverage criteria to the Contract of which Plaintiff was unaware and had no notice. MAMSI relies on its use of the MAMSI Behavioral Health and Psychiatric Level of Care Criteria for Eating Disorders ("Criteria") (Admin. Rec. at pp 303-305) to deny coverage. However, that protocol is not a part of the Contract. Article 9.3 does not authorize MAMSI to create new criteria for treatment, since the term "medically necessary" is fully defined in the policy.

4.    Plaintiff was admitted to River Oaks Hospital ("the Hospital") in New Orleans, Louisiana on October 13, 2004. Plaintiff was indeed diagnosed with bulimia nervosa as MAMSI accurately states. Plaintiff, however, was admitted because of her long history of "restricting, and purging behaviors, which she [was] unable to cease, despite *outpatient* treatment with Corey Walsh, [a] Registered Nutritionist, individual therapy with Mary Stock, LCSW, and prior treatment [at] her home in Washington, [D.C.]. At the time, Plaintiff complained that she was unable to stop and purging." *See* Administrative Record ("Admin. Rec.") at p. 318. The full record of Plaintiff's health status prior to admission is contained in the Statement of Material Facts above, which is incorporated herein by reference.

5.    Defendant's statement that the Plaintiff's admitting physical exam, laboratory workup, and vital signs were normal is accurate. Defendant mischaracterizes the importance of Plaintiff's weight during her treatment, as Plaintiff had had difficulties maintaining her weight before admission. *See* Plaintiff's Statement of Material Facts

above.  Moreover, weight fluctuation is not a conclusive criteria even under MAMSI's extra-contractual Level of Care Criteria.  *See* CSMF 7 and 9, below.

6.    MAMSI claims that the Medical Record makes clear that Plaintiff did not express suicidal ideations during inpatient treatment.  MAMSI SMF at ¶ 6.  First, this claim is irrelevant as "suicidal ideation" is not part of the definition of "medically necessary" and is not even a part of the extra-contractual MAMSI "Level of Care Criteria."  The Medical Record and progress notes state that Plaintiff expressed feeling "depressed, pained, frustrated, angry and sad."  Plaintiff further confessed having what she described as a horrendous body image and qualified certain days as "bad body image days."  *See* November 9, 2004 River Oaks Hospital Partial Progress Notes ("Progress Notes") (Admin. Rec. at p. 609).  Her admitting physician, George Daul, Jr., M.D., noted Plaintiff's ambivalence toward treatment and her "need to remain sick in a family system" where "being sick earns nurturing from her family members."  *See* November 9, 2004 Progress Notes (Admin. Rec. at p. 613).  Plaintiff's history and psychological examination indicate a struggle with anxiety and a history of panic attacks.  *See* Admission Summary (Admin. Rec. at p. 16).  Plaintiff further revealed a history of enduring mood swings, reportedly feeling victim to extreme sadness and irritability.  *See id.*  Furthermore, the Plaintiff practiced physical mutilation during high school, in the form of "cutting" and has periodically been prescribed anti-depressant medication without success.  *See id.*  Finally, though suicidal ideation was denied by the Plaintiff when asked by the examining physician, the Plaintiff reported feelings of ambivalence regarding hope for her future.  *See id.*

C.    **MAMSI's Initial Denial of Coverage**

13

7.    MAMSI claims that it utilized its "criteria for determining medical necessity of an inpatient stay" to deny coverage.  MAMSI SMF ¶ 7.  This is incorrect. The Contract at issue supplies a definition for what qualifies as Medically Necessary. MAMSI did not however, apply this definition to Plaintiff's claim, but rather referred to Criteria not found in the Contract.  Furthermore, MAMSI and its reviewers repeatedly misstate its own Criteria used to reach its decision on Plaintiff's claim and have presented no evidence that any of the medical experts received the correct Criteria to form their opinions.  In its Statement of Undisputed Material Facts 7, MAMSI incorrectly describes its own Criteria.  MAMSI states that the Criteria requires "a finding of at least one of the following criteria:"

  a.    severe weight loss: i.e., refusal to maintain weight at or above 75% of optimal weight;

  b.    medical complications related to weight loss that require 24-hour skilled nursing care such as a heart rate less than 40, blood pressure less than 90/60, temperature less than 97, severe orthostatic changes, severe hypokalemia or hyponatremia, esophageal rupture, or other significantly abnormal test results;

  c.    comorbid biomedical issues such as diabetes or pregnancy that worsen due to the weight loss and need 24-hour skilled nursing care; or

  d.    comorbid psychiatric/substance abuse issues that meet inpatient rehabilitation criteria.

*See* MAMSI Statement of Undisputed Facts at 4.

If the Court determines that the Criteria can be properly considered in Plaintiff's claim, they accurately read as follows:

Admission Criteria are met if any one of 2-4, or 1 and any of 5-8 are met

  1.    Through determined food avoidance in the absence of any physical or mental illness, a refusal to maintain weight = or 75% of optimal body weight or approaching a weight at which physiological instability occurred in the past.

For child/adult, may also be refusal to maintain bmi . 15 or body weight , 85% of optimal body weight during a period of rapid growth.  *There are no particular weight indicators re: bulimia nervosa.*

2.  Medical complications related to eating disorder that require 24 hour skilled nursing care.

3.  Diabetes, pregnancy, cardiovascular disease, or any chronic medical illness that is worsening due to the patient's inability to manage eating disorder symptoms.  Severity requires 24 hour monitoring by skilled nursing team.

4.  Psychiatric issues that meet inpatient acute psychiatric criteria.

5.  Resistant to acceptance of illness and treatment recommendations, or *verbally agrees to participate, but requires 24 hour skilled nursing supervision to resist urges to engage in eating disorder behaviors*

6.  *Inability or unwillingness to comply with refeeding program and restricted exercise without 24 hour skilled nursing supervision* due to severe cognitive distortions, intensive fears, denial of serious illness

7.  *Family conflicts/dysfunction contributes to the perpetuation of the eating disorder due to family's lack of insight, knowledge, coping skills.  Patient is isolated from peers and community resources due to illness.*

8.  *At a lower level of care, demonstrated inability to reverse weight loss or sustain weight gain, even with some supervision.  Inability to control compulsive behaviors including exercise, and binge/purge cycle, even with some supervision.  Non-compliant with treatment.*

*See* Eating Disorder Care Criteria (Admin. Rec. at pp. 303-05)(emphasis supplied).

MAMSI also claims that the Eating Disorder Care Criteria "incorporates the Group Certificate definition of Medical Necessity."  *See* MAMSI Statement of Undisputed Facts at 4.  It does not.  There is no evidence that indicates that the Criteria incorporate the definition of Medical Necessity, nor any evidence that they comport with recognized medical standards.

8.     Morton Albert, M.D., purported to apply the MAMSI "Level of Care Criteria" to conclude that Plaintiff's condition failed to meet the Criteria for inpatient

treatment.  His summary of the MAMSI criteria is inaccurate.  In any event, Plaintiff met the criteria as stated by Dr. Albert due to her inability to manage the eating disorder and comorbid psychiatric issues identified by her treating physicians at admission.

9.     Furthermore, Dr. Albert misapplied the Criteria in denying coverage.  Dr. Albert's denial focuses on Plaintiff's "normal height and weight," and "normal lab values."  Nothing in the Criteria suggests that an enrollee with normal lab values will be summarily denied coverage.  Level of Care Criteria (Admin. Rec. at pp. 303-305). Plaintiff's height, weight and lab values are not relevant to the Criteria cited.  Dr. Albert notes no suicidal ideations or substance abuse issues, but those are not exclusive criteria even under the MAMSI Level of Care Criteria.  Finally, even if the Criteria were applied accurately, MAMSI provides no evidence that Dr. Albert accepts the Criteria as determinative of medical necessity.  In any event, Plaintiff's history of weight fluctuation was amply evidenced in the records of her pre-Admission treatment, all of which the MAMSI reviewers ignored.  *See* Plaintiff's Statement of Material Facts, above.

### D.     The MAMSI Appeal Process

11.     MAMSI claims that an independent consulting case reviewer, Sheldon Glass, M.D., determined that Plaintiff failed to meet the inpatient Criteria.  The Criteria that were used to reach this determination, however, are not provided.

12.     MAMSI's senior medical director, Vera Dvorak, M.D., based, in part on Sheldon Glass' determination, upheld MAMSI's decision.  Defendant states that Plaintiff displayed no "significant comorbid psychiatric issues requiring 24 hour skilled nursing assessment."  Again, Dr. Dvorak misapplied the Criteria in reaching her decision. Moreover, the Criteria, even misapplied, do not require that Plaintiff display *significant*

comorbid psychiatric issues.  Dr. Dvorak further stated that Plaintiff was an "inpatient for 13 days before an antidepressant was prescribed."  This information is not required to satisfy the Criteria, nor does it offer any evidence that Plaintiff did not suffer from mental illness.  It also ignores the fact that Plaintiff was treated with antidepressants unsuccessfully on several occasions by her own physicians before admission to River Oaks, and that she was noncompliant with the treatment regimen.  See Plaintiff's Statement of Material Facts 3, 4, 6, 14, and 15, above.  That she was prescribed an antidepressant after sufficient evaluation indicates the seriousness of her illness.

### E.        The MAMSI Anonymous Review After Complaint

13.     The Court should give no credence to the analysis and determinations of anonymous reviewers.  Defendant provides no authority for why these reviewers must remain anonymous, and the Court should therefore not accept opinions of individuals who cannot be vouched for by name or credentials.  In any event, the opinions of these reviewers are entitled to no weight as they were instructed to ignore the additional medical evidence and statements of Plaintiff's Clinical Social Worker, Mary Stock, presented in a telephone conference and subsequently submitted to IPBRO.  *See* MAMSI Statement of Undisputed Material Facts at 8 and fn. 4.

18.     Anonymous Reviewer-1 claims that Plaintiff first should have been treated with anti-depressant medication on an outpatient basis.  This ignores the fact that Plaintiff was treated with an anti-depressants on an outpatient basis and was not compliant with the prescription.  Moreover, Reviewer-1 reaches the same conclusion regarding Plaintiff's mental health as Plaintiff's treatment team, stating that Plaintiff "clearly [had]

elements of depression," and that her "family history [was] loaded with antidepressant responsive syndromes."  *See* MAMSI SMF ¶ 18 at 9.

19.     Anonymous Reviewer-2 states only that Plaintiff fails to meet Defendant's Criteria.  Again, Defendant provides no evidence that Anonymous Reviewer-2 was provided with a complete and accurate record of the appropriate Criteria.  Nor does the Review contend that the criteria equate with "medical necessity."

20.     MAMSI accepted IPRO's recommendation despite being advised by Plaintiff's counsel that IPRO had chosen to ignore the substantial medical evidence provided during and after the telephone conference.

**F.     The Second Review by IPRO**

23.     Re-reviewer-1, states that Plaintiff was not suffering "severe weight loss," "severe medical complications," or "severe co morbid conditions."  MAMSI SMF ¶ 23 at 10.  The Criteria, however, do not require Plaintiff's weight loss, medical health or condition to be "severe."  *See* Criteria (Admin. Rec. at pp. 303-05).  Nor do the Criteria require that one be "acutely psychotic."  Nonetheless Re-reviewer-1 also agrees with Plaintiff's treatment team and further confirms that Plaintiff was "suffering [from] an eating disorder and a personality disorder."  The Re-reviewer, now allegedly presented with all of Plaintiff's medical records which the Court ordered be included in the review, ignores them.  There is not a single word about Plaintiff's prior medical history, weight struggles, efforts at outpatient treatment, efforts at medication and the River Oaks outpatient treatment that preceded her admission.  *See* May 20, 2005, J. Michael Hannon Letter at pp. 553-58).

24.    Re-reviewer-2 stated that the inpatient admission was not justified because there were outpatient programs available.  MAMSI SMF ¶24 at 11.  This anonymous reviewer provides no evidence as to the availability of such programs in New Orleans.  The only evidence on this point was that there were no comprehensive outpatient programs in New Orleans that provided the care that Plaintiff required.  There is one other outpatient program but it does not promote weight gain, monitor meals, or provide the structure Plaintiff required.  Admin. Rec. at pp.553-58.  Simply put, the River Oaks inpatient program was the only choice available.  The Re-reviewer, now allegedly presented with all of Plaintiff's medical records which the Court ordered be included in the review, ignores them.  There is not a single word about Plaintiff's prior medical history, weight struggles, efforts at outpatient treatment, efforts at medication and the River Oaks outpatient treatment that preceded her admission. *See* May 20, 2005, J. Michael Hannon Letter at pp. 557).

**G.    MAMSI's Segregation of Plaintiff's Claim for Partial Hospitalization**

27.    MAMSI claims that Plaintiff failed to seek or receive pre-certification from MAMSI prior to her subsequent partial hospitalization.  Plaintiff contends that the inpatient care and partial hospitalization are both part of one continuing course of treatment for bulimia nervosa.  This was noted to the District of Columbia during the course of their review, and the pre-certification denial letter was a part of the initial appeal.  *See* March 24, 2005, J. Michael Hannon Letter at p. 739).

28.    MAMSI claims that Plaintiff did not exhaust her administrative remedies and is therefore unable to submit a request for coverage for partial hospitalization.  However, MAMSI did fully consider Plaintiff's claim as to partial hospitalization on a

full record.  Thus, the purpose of exhaustion of administrative remedies has been met, and MAMSI is precluded from claiming that Plaintiff is prohibited from requesting coverage.   Plaintiff has sufficiently exercised her administrative remedies.

Even if the Court, however, determines that the Partial Hospitalization was indeed separate treatment, Plaintiff was still not required to obtain Pre-certification.  The Contract requires Preadmission Authorization only for Hospital Confinement.  *See* Group Certificate (Admin. Rec. at p. 276).  The Contract defines Hospital Confinement as "being registered as a bed patient in a Hospital."  *See* Group Certificate (Admin. Rec. at p. 276).  Plaintiff was not registered as a bed patient during the time that the Hospital provided her with partial hospitalization services and was therefore not required to receive preadmission authorization in order for her treatment to be covered.

## **ARGUMENT**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, affidavits and administrative record demonstrate that there is no genuine issue of material fact in dispute, therefore entitling the moving party to judgment as a matter of law.  Fed. R. Civ. Pro. 56.

In its Motion for Summary Judgment, MAMSI draws improper inferences from the facts, ignores other facts, and relies upon a Level of Care Criteria for determining "medically necessary" treatment which is not part of the Contract of insurance.  Even as to that extra-contractual Level of Care Criteria, MAMSI mischaracterizes Plaintiff's illness and misstates its own Criteria. In any event, there is no evidence that its extra-contractual Level of Care Criteria equates to the dictates of the Contract requiring

payment for treatment that is "medically necessary." Finally, it is clear that MAMSI's Re-reviewers paid no attention to the materials provided by Plaintiff's counsel as ordered by the Court.

## I.    <u>STANDARD OF REVIEW</u>

MAMSI mischaracterizes the scope of its discretion in denying Plaintiff's coverage. It states that the "Group Certificate grants [the Defendant] broad discretion in determining what health services are medically necessary." Citing to Group Certificate, Definition of Medical Necessity (Admin. Rec. at p. 279); MAMSI SMF ¶ 7 at 4-5.

The Supreme Court recently decided that a denial of benefits must be reviewed under a de novo standard unless the benefit plan explicitly grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[2] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). Plaintiff contends that the Court should exercise *de novo* review pursuant to *Firestone* for the reasons discussed below.

In *Firestone*, the plan administrator was interpreting the meaning of a clause in the benefit plan itself. The Supreme Court recognized that this was not generally a determination within the discretion of plan administrators and ordered *de novo* review. The Court stated that the administrators lacked the expertise required to interpret contractual provisions. Likewise, in this case, MAMSI is interpreting the Contract *and* adding terms solely to its benefit. MAMSI's Level of Care Criteria is not part of the Contract, and nothing in the Contract permits MAMSI to adopt extra-contractual standards. The exercise of the enactment of rules and regulations to administer the plan

---

[2]    The arbitrary and capricious standard was developed under the Labor Management Relations Act, 1947 (LMRA) and by some federal courts for § 1132(a)(1)(B) actions because of the absence of a standard of review in ERISA.

does not amount to discretion to change the plan.  Plaintiff contends, therefore, that because MAMSI is relying on an extra-contractual definition of medical necessity for treatment of bulimia nervosa, a *de novo* standard of review should apply.

Furthermore, in *Firestone* the Supreme Court stated that an arbitrary and capricious standard of review, developed under the Labor Management Relations Act 1947 (LMRA), should not be "imported to ERISA on a wholesale basis."  *Firestone,* 489 U.S. at 108-110.  ERISA, a federally mandated statute passed to promote the interest of employees and their beneficiaries and provide enrollees full and fair review of their claims, explicitly authorizes suits against plan administrators to remedy violations such as lack of compliance with a Contract.  *See id.*  In this case, there is nothing in the Contract that puts Plaintiff on notice that she would be subject to unknown extra-contractual Criteria for determination as to what is clearly defined as "medically necessary."  In this case, MAMSI, in denying coverage to Plaintiff, failed to comply with the plain language of the Contract.

Finally, ERISA provisions require that plan administrators provide a "full and fair review" of claim denials.  *See* 29 USC § 1381.  In its inadequate review of Plaintiff's claim, MAMSI failed to appreciate the magnitude of Plaintiff's illness; ignored the pre-Admission medical records provided by her counsel and which this Court ordered to be included in the review; utilized Criteria not contained in the Contract between the parties; and, misstated the extra-contractual Level of Care Criteria.  MAMSI, therefore, did not provide Plaintiff with a full and fair review of her claim and is not entitled to the deferential arbitrary and capricious standard of review.  A *de novo* standard of review should apply.

Even if the Court finds that Plaintiff is not entitled to *de novo* review, Plaintiff contends that, based on its dual status as the policy administrator and the policy insurer, MAMSI operated under a conflict of interest.    Courts have routinely recognized that that there is some degree of conflict of interest inherent in the fact that a party can perform both roles of administering and paying for the plan.    *Sullivan v. LTV Aerospace & Def. Co*., 82 F.3d 1251, 1256 (2d Cir. 1996).  The Court may, therefore, consider the conflict of interest as a  "factor to be [considered] in determining whether there has been an abuse of discretion"    *See id* at 1255.

Under the arbitrary and capricious standard of review, a plan administrator's decision to deny benefits may be overturned if the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler v. First Reliance Standard Life Ins. Co*., 181 F.3d 243, 249 (2d Cir. 1999) (quoting *Pagan v. Nynex Pension Plan*, 52 F.3d 438 at 442 (2d Cir. 1995).  Though the standard of review is deferential to plan administrators, MAMSI's decision to deny coverage was arbitrary and unreasonable; the decision was based on misstated Criteria, a refusal to consider proffered evidence from Plaintiff,  and is not supported by the evidence.  *See Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst*., 46 F.3d 1264, 1271 (2d Cir. 1995).

## II.    "MEDICALLY NECESSARY" UNDER THE HEALTH PLAN

It is undisputed that MAMSI is the administrator of the health plan at issue. MAMSI SMF at ¶¶ 2-3.  Article 9 of the Contract permits Defendant to adopt reasonable "policies, procedures, rules and interpretations to promote orderly and efficient *administration* of this Contract."  *See* Group Agreement, Article 9.3 (emphasis added). Article 9 does not give Defendant the discretion to alter the standards contained in the

Contract for determining what treatment is medically necessary.  Furthermore, the

Contract is silent regarding MAMSI's ability to establish criteria to determine what is, or

is not, Medically Necessary.  The Contract simply provides a definition:

> [H]ealth services which are *reasonably necessary and in the exercise of good medical practice in accordance with professional standards* accepted and commonly available in the United States for treatment of Sickness or Injury as determined by [MLH].  The services must 1) be appropriate and necessary for the symptom's diagnosis, or treatment of the condition; 2) be provided for the diagnosis or direct care or treatment of the condition; 3) not be provided for convenience; 4) be performed or provided in the least costly setting or manner appropriate to diagnose to treat injury or sickness.

*See* Group Certificate, Definition of Medically Necessary (Admin. Rec. at p. 279)

(emphasis added).  It is this language from the Contract that controls whether Plaintiff's

medical treatment was medically necessary.

### III.     MAMSI ABUSED ITS DISCRETION IN DENYING COVERAGE FOR TREATMENT THAT WAS MEDICALLY NECESSARY

Bulimia Nervosa is a physical, as well as a psychological disorder, sometimes

characterized by recurrent episodes of binge eating.  *See generally* Plaintiff's Medical

Record (Admin. Rec. at pp. 318-546).  It is impossible to isolate the physical and

psychological conditions of an individual suffering from the disease.  *See generally*

Internet Encyclopedia of Mind Disorders at http://www.minddisorders.com/Br-

Del/Bulimia-nervosa.html.

Plaintiff began seeking psychiatric treatment for her disorder in 2004 after being

in counseling since the age of five.  As an adult, she first sought treatment with Keith

Henderson, M.D., but was non-compliant with his prescription of prozac for her

depression.  She treated with Dr. Tripitelli for the summer of 2004, resisting her

entreaties at every visit to enter an inpatient program.  Her alarmed physician at the

Tulane Medical Center referred her for outpatient treatment at River Oaks in early fall 2004, at which point she began seeing clinical social worker Mary Stock as well as a nutritionist.  During her time as an outpatient, Plaintiff continued to refuse to eat, lose weight, resist medication, and partake in out of control bingeing and purging.  MAMSI and its reviewers completely ignore these repeated efforts at treatment modalities short of inpatient treatment.  They also do not address the significance of the opinions of her three physicians, including Dr. Tripitelli, that inpatient treatment was necessary.

Plaintiff was diagnosed with the purging subtype of bulimia nervosa, which was characterized by her self-induced vomiting.  *See* Admin. Rec. at pp. 318.  "Vomiting is used by 80%–90% of patients diagnosed with bulimia.  Personal accounts of recovered bulimics suggest that most 'discover' vomiting independently as a way of ridding themselves of the food.  Vomiting is often done to relieve an uncomfortable sensation of fullness in the stomach following a binge as well as to prevent absorption of the calories in the food."  *See generally* Internet Encyclopedia of Mind Disorders at http://www.minddisorders.com/Br-Del/Bulimia-nervosa.html.  Indeed, prior to inpatient admission, Dr. George Daul, the admitting physician, noted that Plaintiff revealed to him that her eating disorder began severely approximately one year earlier.  *See* Admission Summary (Admin. Rec. at p. 318).  She stated that she remembered "feeling uncomfortable after a rather large meal and that, at that time, she decided to throw up."  *See id.*  The Plaintiff went on to recollect that after throwing up she felt better and decided that she could eat as much as she chose.  *See id.*  She began overeating at meals and purging, which subsequently led to  behaviors.  *See id*.

In coordination with Plaintiff's nutritionist, with Mary Stock, with Dr. Jean Tolmas of the Tulane Medical Center, and with Dr. Tripitelli in Washington, D.C., Dr. Daul admitted Plaintiff to the inpatient program on October 13, 2004.  When recommended, inpatient care involves stabilizing the patient, analyzing medications, and providing therapies based on the recommendations of the treatment team, led by the attending physician. The team works to coordinate each patient's individual care.  *See generally* River Oaks Hospital at https://www.riveroakshospital.com/terms/inpatient.htm. Mary Stock stated that Plaintiff required the structure, strict medication and supervision of the inpatient program.  *See generally* May 20, 2005 Letter to IPRO (Admin. Rec. at pp 553-58).  Dr. Stock stated that it was medically necessary for Plaintiff to be placed in inpatient treatment due to her inability to conform her behavior to the treatment protocol and due to complicating psychological issues.  *See* Admission Summary (Admin. Rec. at p. 318).

Plaintiff's treating physicians and clinical psychologists determined that inpatient treatment was necessary and in the exercise of good medical practice.  Furthermore, Mary Stock is of the opinion that it would have been unethical and a breach of the standard of care to not recommend inpatient treatment.  It was, therefore, medically necessary for the treating physicians and clinical psychologists to admit Plaintiff to inpatient care. *See* May 20, 2005 Letter to IPRO (Admin. Rec. at p. 557).

MAMSI abused its discretion by essentially ignoring all of this evidence: the evidence of Plaintiff's prior treatment at River Oaks, her prior treatment at the Tulane Medical Center, and her prior treatment by her Washington, D.C., based physician Caroline Tripitelli, M.D.  The failure to even discuss this evidence speaks volume about

the level of review conducted by MAMSI and those on its behalf.  From MAMSI's

perspective and that of its reviewers, Plaintiff never had any problem with an eating

disorder until she appeared for inpatient treatment at River Oaks.

**IV.    MAMSI ABUSED ITS DISCRETION AND ACTED ARBITRARILY AND CAPRISIOUSLY BY MISSTATING AND MISAPPLYING ITS OWN LEVEL OF CARE CRITERIA**

The language of the Contract is the controlling criteria for Plaintiff's claim.

Plaintiff's counsel on appeal insisted that MAMSI apply the language of the Contract.

*See* May 20, 2005 Letter to IPRO (Admin. Rec. at pp 553-55).  MAMSI, however, claims

that Plaintiff is subject to additional criteria of which Plaintiff had no notice.  In

reviewing Plaintiff's claim, MAMSI utilized criteria set forth in the MAMSI Behavioral

Health and Psychiatric Level of Care Criteria for Eating Disorders ("Eating Disorder

Care Criteria").  Because the Eating Disorder Care Criteria were not part of the Contract,

and because MAMSI has failed to establish that the utilized Criteria are aligned with

established medical standards, MAMSI is contractually obligated to cover health care

services which are reasonably necessary in accordance with professional standards.

Furthermore, MAMSI does not correctly cite the Criteria.  *See* October 14, 2004

MAMSI Coverage-Decision (Admin. Rec. at pp. 1-2).  MAMSI truncates and obliterates

the Eating Disorder Care Criteria as follows:

MAMSI states that the Criteria requires "a finding of at least one of the following

criteria:"

> e.    severe weight loss: i.e., refusal to maintain weight at or above 75% of optimal weight;
>
> f.    medical complications related to weight loss that require 24-hour skilled nursing care such as a heart rate less than 40, blood pressure less than 90/60, temperature less than 97, severe orthostatic changes, severe

hypokalemia or hyponatremia, esophageal rupture, or other significantly abnormal test results;

g.      comorbid biomedical issues such as diabetes or pregnancy that worsen due to the weight loss and need 24-hour skilled nursing care; or

h.      comorbid psychiatric/substance abuse issues that meet inpatient rehabilitation criteria.

*See* MAMSI Statement of Undisputed Facts at 4.

The actual Level of Care Criteria adopted by MAMSI for eating disorders states:

"Admission Criteria are met *if any one of 2-4, or 1 and any of 5-8 are met*

1.  Through determined food avoidance in the absence of any physical or mental illness, a refusal to maintain weight = or 75% of optimal body weight or approaching a weight at which physiological instability occurred in the past. For child/adult, may also be refusal to maintain bmi . 15 or body weight , 85% of optimal body weight during a period of rapid growth. *There are no particular weight indicators re: bulimia nervosa.*

2.  Medical complications related to eating disorder that require 24 hour skilled nursing care.

3.  Diabetes, pregnancy, cardiovascular disease, or any chronic medical illness that is worsening due to the patient's inability to manage eating disorder symptoms. Severity requires 24 hour monitoring by skilled nursing team.

4.  Psychiatric issues that meet inpatient acute psychiatric criteria.

5.  Resistant to acceptance of illness and treatment recommendations, or *verbally agrees to participate, but requires 24 hour skilled nursing supervision to resist urges to engage in eating disorder behaviors*

6.  *Inability or unwillingness to comply with refeeding program and restricted exercise without 24 hour skilled nursing supervision* due to severe cognitive distortions, intensive fears, denial of serious illness

7.  *Family conflicts/dysfunction contributes to the perpetuation of the eating disorder due to family's lack of insight, knowledge, coping skills. Patient is isolated from peers and community resources due to illness.*

8.  *At a lower level of care, demonstrated inability to reverse weight loss or sustain weight gain, even with some supervision. Inability to control*

> *compulsive behaviors including exercise, and binge/purge cycle, even with*
> *some supervision.  Non-compliant with treatment.*

*See* Eating Disorder Care Criteria (Admin. Rec. at pp. 303-05)(emphasis supplied).

MAMSI also claims that the Eating Disorder Care Criteria "incorporates the Group

Certificate definition of Medical Necessity."  *See* MAMSI Statement of Undisputed Facts

at 4.  It does not.

Plaintiff clearly satisfies Criterion 1 and Criteria 5 through 8.  The Criteria 1

requires that an enrollee suffer weight loss, *only* in the absence of physical or mental

illness.  *See* Eating Disorder Care Criteria (Admin. Rec. at p. 303) (emphasis added).

Accordingly, Plaintiff was not required to suffer "severe weight loss" because she was

diagnosed with and endured well-documented mental illness.  Nonetheless, prior to

entering inpatient treatment, Plaintiff was not at her standard weight, weighing nearly

fifteen pounds less.  Nor was she gaining weight.  Some days she did not eat at all, and if

she did it was only about 200 calories at the end of the day.  *See generally* May 20, 2005

Letter to IPRO (Admin. Rec. at pp 553-58).

Plaintiff was also resistant to treatment.  She was not doing what she was asked,

not eating consistently and could not stop bingeing and purging activities.  Plaintiff

required skilled nursing supervision to resist urges to engage in eating disorder behaviors.

*See* Eating Disorder Care Criteria (Admin. Rec. at pp. 303-05); *See generally* May 20,

2005 Letter to IPRO (Admin. Rec. at pp 553-58).

Plaintiff also required strict medication and the supervision and structure of the

inpatient program at the Hospital.  *See id.*  The recovery environment at the Hospital was

particularly important.  Finally, Plaintiff suffered from character pathologies, familial

issues and troubles with peer relationships. *See id.* She was isolated and was unable to monitor her eating disorder on her own. *See id.*

Plaintiff also satisfies Criterion 4, though she need not. She suffered from well-documented comorbid psychiatric issues. MAMSI's independent Reviewer-1, agrees that Plaintiff "clearly had elements of depression." Indeed, her Beck Depression Inventory Test results reported symptoms associated with major depression. *See generally* October 13, 2004 River Oaks Hospital Psychological Evaluation (Admin. Rec. at p. 17-20). The evaluation elaborates that she was also agitated, guilty, impatient, irritable and angry. *See id* at p. 18. Additionally, the treating physicians stated that Plaintiff did not "seem to care what happened to her" and "lost her desire to work out her problems." *See id* at p. 18. Mary Stock, who provided information during the IPRO review, has considered the MAMSI Level of Care Criteria. It is her opinion that Plaintiff's condition met even those standards for inpatient treatment. *See* Declaration of Mary Stock, Exhibit A attached.

MAMSI's denial of coverage is therefore inconsistent with both the Contract at issue and the supplemental, extra-contractual Criteria Defendant utilized in denying Plaintiff's claim. Having established that Plaintiff's treatment was medically necessary, and having satisfied the Criteria, Plaintiff is entitled to coverage.

## V.    PLAINTIFF IS ENTITLED TO COVERAGE FOR HER SUBSEQUENT PARTIAL HOSPITALIZATION TREATMENT

In continuing her treatment, Plaintiff was placed in a partial hospitalization program on November 9, 2004, following her inpatient care. The partial hospitalization services that were provided were a continuation of Plaintiff's inpatient care and began immediately following her inpatient treatment. *See generally* Plaintiff's Admission Record (Admin. Rec. at pp. 5-22). The Hospital states, generally, that Partial

Hospitalization offers immediate access to a safe, structured environment but enables the patient to return home at night. "It is appropriate for patients transitioning from i*npatient to outpatient treatment*; or for patients who do not present any danger to themselves or others, but need a structured treatment plan." *See generally* River Oaks Hospital *https://www.riveroakshospital.com/terms/partialhosp.htm (emphasis added).*

MAMSI argues that Plaintiff's failure to secure Pre-certification for her non-emergent partial hospitalization precludes coverage. MAMSI SMF ¶ 27. This argument is flawed and disregards the fact that Plaintiff's treatment was continuous and ongoing. Moreover, the denial for pre-certification was part of Plaintiff's initial appeal, attached to that appeal as Exhibit 3. *See* March 24, 2005, J. Michael Hannon Letter at p. 739). Relying on this technicality is truly bad faith. Plaintiff continued to attend individual and group therapy sessions at the Hospital. She continued to have her food and nutrition intake measured and observed by Hospital health care providers. And, finally, Plaintiff continued treatment with the same health care professionals with whom she had developed a strong long-term relationship. It is difficult to understand how MAMSI can deny coverage for inpatient treatment on the grounds that it is medically unnecessary and on the other hand deny coverage for partial hospitalization.

Even if the Court determines that the Partial Hospitalization was indeed separate treatment, Plaintiff was still not required to obtain Pre-certification. The Contract requires Preadmission Authorization only for Hospital Confinement. *See* Group Certificate (Admin. Rec. at p. 276). The Contract defines Hospital Confinement as "being registered as a bed patient in a Hospital." *See* Group Certificate (Admin. Rec. at p. 276). Plaintiff was not registered as a bed patient during the time that the Hospital

provided her with partial hospitalization services and was, therefore, not required to receive preadmission authorization in order for her treatment to be covered.

Finally, Plaintiff is not precluded from seeking coverage for her partial hospitalization on account of not having exhausted her administrative remedies. MAMSI has considered this claim in its entirety, including a review of all of the medical records. Having considered the claim, all of the goals of administrative review have been met, and MAMSI cannot be heard to complain of further review on appeal.

## VI.    MAMSI's REFUSAL TO PAY FOR ANY MEDICAL CARE WAS ARBITRARY AND CAPRICIOUS

Pursuant to the Contract at issue, Plaintiff is entitled to full coverage for medically necessary treatment. MAMSI and its reviewers acknowledge that Plaintiff was very sick and required medical care. Indeed, through the medical care Plaintiff actually received she improved and was discharged to resume her education with appropriate follow-up. Plaintiff's counsel upon review specifically pointed out that MAMSI covered none of the medical expenses incurred by Plaintiff even though MAMSI agreed some medical care was required. Plaintiff's counsel alleged that complete failure to consider any payment was clear evidence of bad faith.

> We have obtained and included the billing records from River Oaks. Even if MAMSI took the position that inpatient care would not be covered, the treatment modalities applied during that time period were clearly covered mental health services. For MAMSI to fail to consider covering all services except for the daily bed rate is evidence of its bad faith. In any event, all of the expenses should have been covered by MAMSI from the outset.

There was absolutely no response to this demand.

Denial of any coverage is unsupported by substantial evidence and erroneous pursuant to the Contract. *See* Group Certificate (Admin. Rec. at pp. 303-05 ); *Pagan v.*

*Nynex Pension Plan*, 52 F.3d 438 at 442 (2d Cir. 1995).  Accordingly, Defendant's denial

of coverage for any of the medical care provided during her hospitalization is entirely

arbitrary and capricious.  Plaintiff is entitled to a full and fair review of her claim.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  Plaintiff was given neither.

MAMSI subjectively reviewed Plaintiff's medical condition, added and applied

supplemental criteria to Plaintiff's claim and misstated the additional criteria to Plaintiff's

detriment.

## CONCLUSION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff respectfully requests that

the Court deny summary judgment for Defendant MAMSI and grant Summary Judgment

in its favor and against Defendant.  Plaintiff has demonstrated that the Hospital treatment

was medically necessary and is therefore covered by the Contract at issue.  Moreover,

Defendant's misapplication of the Contract and Criteria amount to an arbitrary and

capricious dismissal of Plaintiff's claim.  As a result, Defendant cannot prevail as a

matter of law in its denial of coverage for Plaintiff.

Dated November 6, 2006                          Respectfully submitted,

                                                HANNON LAW GROUP, LLP


                                                ___*//s// J. Michael Hannon //s//*___
                                                J. Michael Hannon, #352526
                                                1901 18th Street, NW
                                                Washington, DC 20009
                                                (202) 232-1907
                                                Fax:  (202) 232-3704
                                                *Counsel for Plaintiff Jane Doe*