## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
**JANE DOE,**                                   )
                                                )
            **Plaintiff,**                      )
                                                )
            **v.**                              )   **Civil Action No. 05-2450 (ESH)**
                                                )
**MAMSI LIFE AND HEALTH**                       )
  **INSURANCE COMPANY,**                        )
                                                )
            **Defendant.**                      )
_____)

### <u>MEMORANDUM OPINION</u>

Plaintiff has brought suit under the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001, *et seq.*, challenging the denial of claims for health care benefits

for inpatient and outpatient treatment of bulimia nervosa under a private employer-sponsored

group welfare benefit plan.  The parties agree that the plan is governed by ERISA, and that

defendant MAMSI Life and Health Insurance Company ("MAMSI") administers the plan under

which plaintiff received health benefits pursuant to 29 U.S.C. § 1002(16)(A).  (Def. Facts ¶¶ 1-3;

Def. Mot. at 1; Pl. Reply at 2.)  The case is presently before the Court on the parties' cross-

motions for summary judgment.  For the reasons explained herein, the Court will deny

defendant's motion in part and grant plaintiff's motion in part insofar as it remands the case to

MAMSI for reconsideration of its denial of coverage for plaintiff's inpatient treatment.  The

Court, however, will deny plaintiff's motion in part insofar as it seeks reversal of MAMSI's

decision regarding plaintiff's claim for coverage of her outpatient treatment.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was admitted to River Oaks Hospital in New Orleans, Louisiana on October 13, 2004, for the treatment of bulimia nervosa.  (A.R. 318.)  At the time she was a 20-year-old college student enrolled at a Louisiana college.  (A.R. 318, 324.)  The administrative record indicates that plaintiff had a history of anxiety, panic attacks, and depression.  (A.R. 326, 328.)  Her binging and purging behavior apparently began in November 2003.  (A.R. 582.)  The record indicates that plaintiff had not experienced any suicidal ideation (A.R. 318, 328, 338), but she reported that at times, she had a strong urge to "do something shocking or harmful."  (A.R. 328.)  She also reported a history of "cutting" or self-mutilation while in the eleventh grade.  (A.R. 326.)  Plaintiff first sought psychiatric treatment for her eating disorder in the spring of 2004 with Dr. Henderson in New Orleans, and she continued treatment with Dr. Trippitelli in Washington, D.C. -- plaintiff's home city -- in the summer of 2004, before returning to New Orleans at the end of August for her junior year in college.  (A.R. 324, 556, 578.)  Both Drs. Henderson and Trippitelli prescribed the anti-depressant drug Prozac to plaintiff.  (A.R. 556, 583.)  She reported to Dr. Trippitelli that the Prozac improved her binging and purging behavior (A.R. 582), but plaintiff apparently discontinued the medication, and she was not taking any anti-depressant medications at the time of her admission to River Oaks.  (A.R. 582, 326, 664.)  Dr. Trippitelli also recommended that plaintiff seek inpatient or partial hospitalization treatment for her eating disorder in July 2004, but plaintiff resisted her suggestion at that time.  (A.R. 324, 583.)

Plaintiff's binging and purging behavior continued after her return to school in New Orleans in the fall of 2004.  (A.R. 318, 324, 327.)  She reported binging and purging up to

fourteen times per week in the two to three months leading up to her admission, and she also reported taking up to thirty-five diet pills per week. (A.R. 326-27.) Several weeks prior to her inpatient admission, plaintiff began outpatient treatment for bulimia with social worker Mary Stock at River Oaks and a nutritionist. (A.R. 318, 556.) Upon admission to River Oaks, plaintiff, who stands 5'2" tall, weighed 117 or 119.2 pounds. (A.R. 326, 357.) She reported that in the preceding year-and-a-half, her maximum weight was 135 pounds, and her minimum weight was 110 pounds. (A.R. 318, 357.) The record indicates that the River Oaks Staff considered the "[i]deal body weight" for plaintiff to be 110 pounds, plus or minus 10 percent. (A.R. 357.) Plaintiff remained as an inpatient at River Oaks, where she received extensive individual and group and family therapy, until November 8, 2004 (*see generally* A.R. 367-436), at which point she transitioned into River Oaks' Partial Hospitalization Program ("PHP"). The PHP program provided a similar level of therapy as the inpatient program, as well as supervised meals, but plaintiff slept at her own home each night. (*See generally* A.R. 602-54.) Her PHP treatment concluded on November 22, 2004. (A.R. 654.)

Plaintiff's doctors submitted two claims to MAMSI for the treatment she received at River Oaks during October and November of 2004. Initially, a River Oaks staff member made a telephone request for coverage for "acute inpatient psychiatric hospitalization" upon plaintiff's admission on October 13, 2004. (A.R. 1-2, 307-08.) By letter dated October 14, 2004, MAMSI denied plaintiff's first claim on the grounds that inpatient hospitalization was not "medically necessary" for the treatment of her medical condition. (A.R. 1-2.) Plaintiff's caregivers then submitted a subsequent claim for her PHP treatment on November 9, 2004. (A.R. 236, 776.) By letter dated November 10, 2004, MAMSI denied plaintiff's second claim, this time on the

grounds that plaintiff had failed to obtain pre-certification, as required by the Group Certificate, prior to her admission for the PHP, which MAMSI considered to have been "non-emergent and elective."[1]  (A.R. 236-40.)  The Group Certificate notes that the insured must "seek and receive" pre-certification from MAMSI "before receiving certain non-Emergency outpatient Health Services . . . ." (A.R. 280.)

As the plan administrator, MAMSI is responsible for making benefit coverage decisions. MAMSI is also the provider of hospital and medical insurance benefits to plan enrollees and has agreed to provide such benefits in accordance with applicable plan documents.  Most relevant for present purposes are the MAMSI Group Hospital and Insurance Policy Contract Face Sheet (the "Group Agreement") (Def. Facts Ex. A) and the MAMSI Group Certificate.  (A.R. 271-301.) The Group Agreement provides that MAMSI "may adopt reasonable policies, procedures, rules and interpretations to promote orderly and efficient administration of this Contract, and Employer agrees to cooperate with [MAMSI] in administering such rules and regulations."  (Def. Facts Ex. A at Article 9.3.)  The Group Certificate, in turn, describes the coverage available to plan enrollees and the procedures required to obtain coverage.  The plan "does not cover . . . Services that are not Medically Necessary."  (A.R. 284.)    As defined in the Group Certificate, "Medically Necessary" means

> Health Services which are reasonably necessary and in the exercise of good medical practice in accordance with professional standards accepted and commonly available in the United States for treatment of Sickness or Injury *as determined by the Company*.  The service must 1) be appropriate and necessary for the symptom's diagnosis, or

---

[1]  On November 11, 2004, MAMSI sent plaintiff a slightly revised denial letter, which clarified that MAMSI was denying the claim on the sole ground that plaintiff had failed to obtain pre-certification.  (A.R. 254-59.)

treatment of the medical condition; 2) be provided for the diagnosis or direct care or treatment of the condition; 3) not be provided for convenience; and 4) be performed or provided in the least costly setting or manner appropriate to diagnose or treat the Injury or Sickness.

(A.R. 279 (emphasis added).)

## I.    Inpatient Care

In denying coverage for plaintiff's inpatient treatment as not medically necessary, MAMSI claims to have relied on its internal "Eating Disorder Care Criteria" ("the Criteria"). (Def. Facts ¶ 7.)  The Criteria, which were approved in September 2003, provide that "acute inpatient" treatment for anorexia nervosa or bulimia nervosa is warranted when "[a]ny one of 2-4, or 1 and any one of 5-8" of the following conditions are met:

1.    Weight Issues:  Through determined food avoidance in the absence of any physical or mental illness, a refusal to maintain weight = or >75% of optimal body weight or approaching a weight at which physiological instability occurred in the past. For child/adol, may also be refusal to maintain bmi >15 or body weight <85% of optimal body weight during a period of rapid growth. (There are no particular weight indicators re: bulimia nervosa).

2.    Medical complications related to Eating Disorder: There are medical complications that require 24 hour skilled nursing care . . . .

3.    Comorbid Biomedical issues:  Diabetes, Pregnancy, Cardiovascular Disease, or any chronic medical illness that is worsening due to the patient's inability to manage eating disorder symptoms. Severity requires 24 hour monitoring by skilled nursing team.

4.    Comorbid Psychiatric/Substance Abuse Issues:  Psychiatric issues that meet inpatient acute psychiatric criteria. Substance Abuse Issues that meet inpatient rehab.  ASAM criteria.

5.      Readiness to Change/Engagement in Treatment:  Resistant
        to acceptance of illness and treatment recommendations, or
        verbally agrees to participate, but requires 24 hour skilled
        nursing supervision to resist urges to engage in eating
        disorder behaviors.

6.      Need for structure:  Inability or unwillingness to comply
        with refeeding program and restricted exercise without 24
        hour skilled nursing supervision due to severe cognitive
        distortions, intensive fears, denial of serious [sic] of illness.

7.      Recovery Environment:  Family conflicts/dysfunction
        contribute to the perpetuation of the eating disorder due to
        family's lack of insight, knowledge, and coping skills.
        Patient is isolated from peers and community resources due
        to illness.

8.      Response to adequate treatment at lower levels of care:  At
        lower level of care, demonstrated inability to reverse
        weight loss or sustain weight gain, even with some
        supervision. Inability to control compulsive behaviors
        including exercise and binge/purge cycle, even with some
        supervision. Non-compliant with treatment.

(A.R. 303-05.)  MAMSI's initial denial on October 14, 2004, of plaintiff's claim for inpatient

treatment stated that under the Criteria, "medical necessity for acute psychiatric inpatient

admission is substantiated by one of the following: medical complications which require 24 hour

skilled nursing care, comorbid biomedical issues which are worsening due to the patient's

inability to manage the eating disorder, or comorbid psychiatric issues which require 24 hour

skilled nursing care."  (A.R. 1.)  The letter explained that because plaintiff was "at normal height

and weight," had "normal lab values," and had "no reported medical consequences of the eating

disorder which required 24 hour monitoring[] and . . . no coexisting psychiatric, substance abuse,

or medical issues," medical necessity for inpatient treatment "could not be substantiated."  (*Id.*;

*see also* A.R. 308 [MAMSI notes stating that plaintiff did not meet the criteria for inpatient acute

care treatment for eating disorder].)

On November 9, 2004, Dr. George Daul of River Oaks submitted an appeal on plaintiff's behalf of MAMSI's inpatient coverage denial for the period of October 13 though November 8, 2004, to MAMSI's medical affairs appeals department. (*See* A.R. 4, 260-61.) This appeal was reviewed by a board-certified consulting psychiatrist, Dr. Sheldon Glass, and by a MAMSI medical director, Dr. Vera Dvorak -- neither of whom appears to have been involved in MAMSI's initial coverage decision. (A.R. 260-65.) Dr. Glass's handwritten notes are difficult to read, but he appears to have noted that plaintiff did not "meet the inpatient admission criteria for eating disorders" because she had "no wt loss, no medical complication, no comorbid medical problem . . . , [vital signs] stable, no significant psychiatric problems. . . , no isolation from peers . . . [and] no significant attempt at lower level of [treatment], e.g. partial hospitalization." (A.R. 263.) By letter dated December 2, 2004, Dr. Dvorak of MAMSI informed plaintiff that the denial of coverage for the inpatient treatment from October 13 to November 8, 2004, had been upheld on appeal. (A.R. 264-65.) Dr. Dvorak also cited the Criteria, and like MAMSI's initial denial of inpatient benefits, stated that "medical necessity" requires "medical complications which require 24 hour skilled nursing care, comorbid biomedical issues which are worsening due to the patient's inability to manage the eating disorder, or comorbid psychiatric issues which require 24 hour skilled nursing care." (A.R. 264.) Dr. Dvorak also noted that there was "no documentation of severe weight loss." (*Id.*)

Plaintiff, who by this point had apparently retained counsel, next sought independent external review of the denial of her inpatient claim, pursuant to the Health Benefits Plan Members Bill of Rights Act of 1998, D.C. Code § 44-301.01, *et seq.*, by appealing MAMSI's

inpatient coverage decision to the Director of the District of Columbia Department of Health.

(*See* A.R. 268 [Feb. 28, 2005 Letter from P. Kelly to MAMSI informing MAMSI of plaintiff's

appeal of her denial of coverage for inpatient treatment and requesting transmission of the

record].)  Along with its records on the denial of plaintiff's inpatient claim, MAMSI forwarded

its Eating Disorder Care Criteria, exactly as quoted *supra*, to the D.C. Department of Health.

(*See* A.R. 269, 303-05.)  In an accompanying cover letter to Patrick Kelly, the D.C. Grievance

and Appeals Coordinator, Tamar Thorne of MAMSI described the Criteria as requiring

> that member must have either:  a) medical complications related to
> the eating disorder requiring twenty-four (24) hour skilled nursing
> care; b) a chronic medical illness that is worsening due to the
> member's inability to manage eating disorder symptoms and the
> severity of these symptoms require 24-hour monitoring by a skilled
> nursing team; or c) psychiatric or substance abuse issues that meet
> inpatient criteria.  *Additionally*, the member must either: a) display
> a readiness to change and engage in treatment, but require 24-hour
> skilled nursing supervision to resist urges to engage in eating
> disorder behaviors; b) display an inability or unwillingness to
> comply with refeeding program and restricted exercise without 24-
> hour skilled nursing supervision; c) family conflicts contribute to
> the perpetuation of the condition due to family's lack of insight,
> knowledge, and coping skills or the patient is isolated from peers
> and community resources due to illness; or d) at a lower level of
> care the member demonstrated an inability to reverse weight loss
> or sustain weight gain . . . .

(A.R. 269-70 (emphasis added).)

In accordance with the Act, the Director of the D.C. Department of Health appointed

IPRO, Inc. ("IPRO"), an independent review organization, to conduct the review through

consideration of all pertinent medical records, physician reports and other materials submitted by

the parties.  (*See* A.R. 547-50.)  One condition for the external review was that the "member

ha[d] exhausted all internal grievance levels."  (A.R. 547.)  At the request of plaintiff's counsel,

IPRO conducted a telephonic hearing on May 18, 2005. (A.R. 552, 748.) Two anonymous reviewers examined the record, and on May 26, 2005, IPRO determined that MAMSI's coverage decision should be upheld. (A.R. 748-51). MAMSI's Eating Disorder Care Criteria appear to be among the materials provided to IPRO for review. (*See* A.R. 749 [IPRO decision, listing Letter from T. Thorne to P. Kelly dated 3/9/05, which enclosed, *inter alia*, the Criteria].) The first IPRO reviewer did not specifically address MAMSI's Criteria, but instead he or she determined that inpatient hospitalization was not indicated because outpatient treatment that met the standard of care for bulimia, including treatment with anti-depressant medication, should have been undertaken before resorting to hospitalization. (A.R. 750.) The second IPRO reviewer noted that plaintiff "did not meet the insurer's written criteria for inpatient treatment," which he or she described as requiring "severe weight loss, medical complications related to eating disorder, comorbid biomedical issues, and comorbid psychiatric/substance abuse issues." (A.R. 751.) Additionally, the second reviewer determined that plaintiff's condition "did not meet the level of medical necessity requiring inpatient treatment consistent with the general standards of clinical psychiatric practice," and that PHP treatment was indicated instead. (*Id.*) On June 2, 2005, MAMSI implemented IPRO's recommendation and once again confirmed its decision to deny coverage. (A.R. 754.)

Plaintiff initiated this action on December 20, 2005. In addition to her claims against MAMSI, plaintiff also sued IPRO, alleging that IPRO had improperly rendered its determination without considering -- as it allegedly had agreed to do at the May 18, 2005 telephonic hearing -- additional medical records furnished by plaintiff's counsel. On March 21, 2006, this Court dismissed with prejudice all counts against IPRO but one, and at the Court's suggestion, IPRO

agreed to review the additional records proffered by plaintiff's counsel and, if necessary, to revise its determination. (*See* Order, Mar. 21, 2006.) The additional materials included a May 20, 2005 letter from plaintiff's counsel describing plaintiff's treatment for bulimia with Drs. Henderson and Trippitelli and with social worker Mary Stock that preceded her admission to River Oaks,[2] as well as the medical records from plaintiff's treatment with Dr. Trippitelli, her college health center, and the PHP treatment at River Oaks. (*See* A.R. 553-5.) Again, two anonymous IPRO reviewers -- apparently the same two doctors who had conducted the first IPRO review -- reaffirmed their initial determination on April 18, 2006. (A.R. 762-67.) Both reviewers acknowledged receipt of the new materials for purposes of their second reviews. (A.R. 765, 767.) Also, the reviewers appear to have been provided with MAMSI's Criteria (*see* A.R. 763), though neither of the second IPRO reviews referenced them directly. (*See* A.R. 765-67.) One IPRO reviewer re-affirmed MAMSI's decision because plaintiff "was not suffering with severe weight loss, severe medical complications related to her eating disorder, or severe co-morbid conditions that required inpatient care," and she "could have been safely and adequately treated at a PHP level of care." (A.R. 766.) The second reviewer focused on the fact that plaintiff was not medically unstable, and that there was no attempt to treat plaintiff at a less restrictive level of care, such as the PHP, prior to her inpatient admission. (A.R. 767.) Again, MAMSI accepted IPRO's recommendations and upheld its denial of benefits for inpatient care.

---

[2]Plaintiff has also submitted with her instant motion the declaration of Mary Stock, which supports many of the assertions in the May 20, 2005 letter written by plaintiff's counsel. However, as the Court explained in its earlier opinion in this case, where, as here, the Court is reviewing a benefits determination under a deferential standard, it typically may consider only the evidence in the administrative record. *See Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1455 (D.C. Cir. 1992); see *also Doe v. MAMSI Life & Health Ins. Co.*, 448 F. Supp. 2d 179, 183 (D.D.C. 2006). Defendant's motion to strike the declaration of Mary Stock is therefore granted.

Subsequently, on June 26, 2006, the Court granted IPRO's renewed motion for entry of judgment of dismissal with prejudice as to the final remaining count, thereby removing IPRO as a party to this litigation. (Minute Order, June 26, 2002.)

## II.    PHP Care

While actively pursuing her appeals on the denial of her claim for inpatient care, plaintiff failed to internally appeal MAMSI's November 11, 2004 denial of her claim for PHP coverage. The November 11, 2004 letter denying coverage for plaintiff's PHP treatment for failure to obtain pre-certification stated that plaintiff had the right to appeal the decision to MAMSI verbally or in writing within 180 calendar days of the initial denial, and it provided information on how to submit an appeal. (A.R. 256.) There is no evidence of such an appeal of the PHP coverage decision in the record. On March 24, 2005, within the 180-day limitations period for internal appeals, plaintiff's counsel wrote directly to IPRO, stating that he had been retained by plaintiff "regarding her appeal of MAMSI's decision to deny coverage for inpatient treatment from October 13, 2004 to November 8, 2004," and that on "continuing review of this matter, it appears to us that this claim should include refusal of MAMSI to cover what it described as a 'parti[]al hospitalization program' that began on November 9, 2004." (A.R. 739.) Plaintiff's counsel argued that the PHP treatment was not a new hospitalization, but a continuation of the treatment that began on October 13, 2004. (*Id.*) IPRO did not address any claim for PHP treatment. And, although counsel must have recognized within the prescribed limitations period that MAMSI's November 11, 2004 denial of PHP coverage had not been appealed internally, he failed to submit a timely internal appeal to MAMSI.

## ANALYSIS

**I.    Standard of Review of MAMSI's Benefits Determinations**

Pursuant to the Supreme Court's decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), under ERISA, the denial of benefits by a claims administrator or fiduciary is subject to the deferential "abuse of discretion" or "arbitrary and capricious" standard of review when "the benefit plan gives the administrator a fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. The D.C. Circuit has characterized this "plainly deferential" standard of review required by *Firestone* as one of "reasonableness." *Wagener v. SBC Pension Benefit Plan--Non Bargained Program*, 407 F.3d 395, 402 (D.C. Cir. 2005) (citing *Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1452, 1454 (D.C. Cir. 1992)); *see also Moore v. CapitalCare, Inc.*, 461 F.3d 1, 11 (D.C. Cir. 2006). The Group Agreement allows MAMSI to "adopt reasonable policies, procedures, rules and interpretations to promote orderly and efficient administration of this Contract, and Employer agrees to cooperate with [MAMSI] in administering such rules and regulations." (Def. Facts Ex. A at Article 9.3.) The Group Certificate provides that the plan "does not cover . . . Services that are not Medically Necessary" (A.R. 284), and it specifies that medical necessity is to be "determined by the company" consistent with common professional standards. (A.R. 279.) As this Court previously determined, this language confers discretion and merits the application of *Firestone*'s deferential standard of review. *See Doe v. MAMSI Life & Health Ins. Co.*, 448 F. Supp. 2d 179, 182 (D.D.C. 2006).

Despite her previous concession that the correct standard of review is arbitrary and capricious (*see* Pl. Opp. To Def.'s Protective Order at 8), plaintiff now argues for the first time

that the Court's review should instead be *de novo* because MAMSI's decision was based on its

interpretation of the term "medically necessary" in the Group Certificate, and plan administrators

are not qualified to interpret contract language. (Pl. Mot. at 21.)  Furthermore, plaintiff argues,

by relying on the Eating Disorder Care Criteria, MAMSI was adding impermissible extra-

contractual terms "solely to its benefit." (*Id.* at 21-22.)  This argument, however,

mischaracterizes the nature of MAMSI's analysis: in utilizing the Criteria, MAMSI was

attempting to apply or administer the medical necessity clause in the Group Certificate, as the

Group Certificate and Group Agreement authorize it to do.  (*See* Def. Facts Ex. A at Article 9.3;

A.R. 279.)  The Group Certificate and Group Agreement encompass precisely the type of

discretion that confers deferential review under *Firestone*. *See Abatie v. Alta Health & Life Ins.

Co.*, 458 F.3d 955, 963-64 (9th Cir. 2006) (*en banc*).

　　　The plaintiff argues in the alternative that if the Court were to apply a deferential

standard of review under *Firestone*, that deference should be tempered because MAMSI

operated under a conflict of interest when making the decision to deny plaintiff's claim.  (Pl.

Mot. at 23.)  An insurer who acts as both the plan administrator and the funding source for

benefits does operate under a "structural conflict of interest," *see Abatie,* 458 F.3d at 965, and

under *Firestone*, the Court must consider this conflict of interest as a factor in its review, though

the standard of review remains clearly deferential. *See Firestone*, 489 U.S. at 103, 115.  The

circuits have formulated different methods for applying the deferential standard of review in

conflicts of interest cases, *see, e.g., Abatie*, 458 F.3d at 959 (describing the appropriate standard

as "abuse of discretion review[] tempered by skepticism commensurate with the plan

administrator's conflict of interest"), but the D.C. Circuit has not yet addressed this issue. *See*

-13-

*Hurley v. Life Ins. Co. of N. Am.*, 04-252, 2006 WL 1883406, at *3 n.3 (D.D.C. July 9, 2006);

*see also Wagener*, 407 F.3d at 402-03 (declining to determine the appropriate standard of review

in conflict of interest cases under *Firestone*). However, in light of the Court's conclusion that

this case must be remanded to MAMSI to properly apply its Eating Disorder Care Criteria and

consider the evidence under that Criteria, it is unnecessary at this stage to resolve the question of

exactly how much deference is due to an administrator's decision where there is arguably a

conflict of interest. *See Schwarzwaelder v. Merrill Lynch & Co.*, 04-1879, 2006 WL 3692589, at

*4 (W.D. Pa. Dec. 12, 2006).

## II.    Denial of Benefits for Plaintiff's Inpatient Treatment

Defendant argues, and the Court agrees, that the Group Agreement allows it to adopt

uniform standards, including the Eating Disorder Care Criteria, to guide it in making "reasonable

coverage decision[s]" under the plan. (Def. Reply at 6.) Indeed, the application of uniform

criteria helps to ensure that the defendant's benefits determinations will not be arbitrary or

capricious. Plaintiff's argument that defendant was not permitted to adopt such criteria (*see* Pl.

Reply at 18) is also refuted by the plain language of the Group Agreement. (*See* Def. Facts Ex.

A at Article 9.3.) However, once it has adopted such criteria, MAMSI is bound to apply them

honestly and consistently. To ignore, misapply, or inconsistently apply its own criteria would,

almost by definition, be arbitrary and capricious. *See, e.g.*, *WHX Corp. v. SEC*, 362 F.3d 854,

859 (D.C. Cir. 2004) (noting that abuse of discretion review, while deferential, includes

verifying whether an agency complied with its own standard).

It appears from MAMSI's denial of plaintiff's claim for her inpatient treatment, and on

each of the subsequent reviews of that denial, that the reviewers misinterpreted, misapplied, or

ignored the plain language of MAMSI's own Eating Disorder Care Criteria.  In particular, each

of these decisionmakers either ignored or misstated Criteria 1, which appears to require a refusal

to maintain weight greater than or equal to 75 percent of the patient's optimal weight only "in

the absence of any physical or mental illness."  (A.R. 303.)  None of the internal or external

reviewers ever acknowledged this language or attempted to reconcile it with the evidence of

plaintiff's history of psychological problems.  And, all of the reviewers appear to ignore entirely

the caveat contained in Criteria 1 that "[t]here are no particular weight indicators re: bulimia

nervosa."[3]  (*Id.*)  On the contrary, many of the reviewers emphasize plaintiff's weight at the time

of her admission and treat the fact that she was not below the optimal weight for someone of her

height and did not demonstrate "severe weight loss" as dispositive of the question of whether

inpatient treatment was medically necessary.  For example, the initial denial letter noted that

plaintiff was "at normal height and weight."  (A.R. 1.)  In evaluating plaintiff's first appeal to

MAMSI, Dr. Glass noted that MAMSI's decision was correct because, among other things,

plaintiff showed "no wt loss" (A.R. 263), and Dr. Dvorak also noted that there was "no

documentation of severe weight loss." (A.R. 264.)  Similarly, during the first IPRO review, one

of the anonymous reviewers incorrectly described MAMSI's Criteria as requiring "severe weight

loss," and this unsupported "severe weight loss" requirement was then echoed in IPRO's second

review.  (A.R. 751, 766.)  The language of MAMSI's Criteria for inpatient treatment for bulimia

does not appear to require weight loss at all, let alone "severe" weight loss.

  In addition, each of the reviewers appears to have ignored the statement in the Criteria

---

[3]Indeed, even in its summary judgment pleadings, defendant misleadingly paraphrases
Criteria 1 by omitting the clause about mental illness and the caveat that there are no particular
weight indicators for bulimia nervosa.  (*See, e.g.*, Def. Mot. at 6; Def. Reply at 9.)

that a combination of "[a]ny one of 2-4, or 1 and any one of 5-8 " of the Criteria can substantiate medical necessity for inpatient treatment. (A.R. 303.) For example, the description of the criteria in MAMSI's initial denial letter purports to require Criteria 2 (medical complications), Criteria 3 (cormorbid biomedical issues), or Criteria 4 (comorbid psychiatric issues), with not even a mention of Criteria 1 or 5 through 8. (A.R. 1.) Dr. Dvorak's December 2, 2004 letter denying plaintiff's appeal echoes this misstatement of the Criteria. (A.R. 264.) The letter written by MAMSI's State Investigation Manager Tamar Thorne to the D.C. Grievance and Appeals Coordinator also misstates MAMSI's Criteria, but this time the Criteria are inaccurately described as requiring one of Criteria 1, 2 or 3, and "*[a]dditionally*" requiring one of Criteria 5, 6, 7 or 8. (A.R. 269-70 (emphasis added).) The IPRO reviewers also appear to either ignore or misapply (as MAMSI had) the Criteria in each of their reviews. (*See, e.g.*, A.R. 766 (seeming to require "severe weight loss," Criteria 2 ("severe medical complications"), or Criteria 3 ("severe comorbid medical complications"), *plus* Criteria 8 (failure to respond to a lower level of care)).) These statements of the Criteria are inconsistent with each other, and, more importantly, they appear to be inconsistent with the plain language of the Criteria as written by MAMSI. None of the decisionmakers who evaluated plaintiff's claim addressed the possibility she met the Criteria by satisfying Criteria 1 -- either because it did not apply to patients with "mental illness" or because there are "no particular weight indicators" for bulimia -- plus any one of Criteria 5 through 8. As a result, it is impossible for the Court to ascertain what standard was actually applied by MAMSI and the reviewers in reaching their decisions, and the Court therefore cannot uphold MAMSI's denial of inpatient benefits as reasonable on the record before it. *See Schwarzwaelder*, 2006 WL 3692589, at *5.

-16-

Furthermore, even assuming that the IPRO reviewers somehow properly applied MAMSI's Criteria when they undertook their second review, which included all the new material submitted by plaintiff's counsel, they failed to provide a sufficient explanation of how the Criteria -- and specifically Criteria 1 -- apply to the evidence in the record.  Again, these reviewers focused on plaintiff's weight and the possibility that she may have been successfully treated at a lower level of care, but they did not meaningfully address the evidence of plaintiff's history of psychiatric problems in light of the language in Criteria 1, which appears to exempt patients with "mental illness" from any weight loss requirement.[4]  (A.R. 762-67.)  Because MAMSI has adopted the Criteria as its framework for deciding when inpatient treatment is medically necessary for patients suffering from eating disorders, the decisions of its internal and external reviewers must, at a minimum, correctly apply those Criteria to the evidence.

Where, as here, a plan administrator has "applied a wrong standard to a benefits determination" or "fail[ed] to make adequate findings or explain adequately the grounds of [its] decision," remand to the plan administrator for reconsideration is the appropriate remedy. *Kaelin v. Tenet Employee Benefit Plan*, 04-2871, 2006 WL 2382005, at * 4 (E.D. Pa. Aug. 16, 2006) (quoting *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Plan*, 85 F.3d 455, 460 (9th Cir. 1996), and *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002)) (internal quotation marks omitted and alterations in original); *see also Vizcaino v.*

---

[4]Because the IPRO reviewers apparently either misunderstood or misapplied Criteria 1, they do not discuss the applicability of Criteria 5 (readiness to change), 6 (need for structure) or 7 (family conflicts/dysfunction and isolation from peers) in their second review.  (*See* A.R. 303-05; 765-67.)  But even a cursory review of the record, including the new material considered by IPRO on their second review, reveals evidence regarding plaintiff's family conflicts, isolation from peers, and need for structure that will have to be addressed on remand.  (*See, e.g.*, A.R. 584-85, 589, 318, 325, 351.)

*Microsoft Corp.*, 120 F.3d 1006, 1013-14 (9th Cir. 1997) (remanding review of a denial of

benefits to plan administrator, "who has the primary duty of construction," to determine an

interpretation of the plan "in the first instance"). The case is therefore remanded to MAMSI to

reconsider its denial of inpatient benefits and to explain how the Criteria apply to *all* the

evidence in the record, including the new evidence considered for the first time by IPRO on its

second review.

### III.    Denial of Benefits for Plaintiff's Subsequent Partial Hospitalization Program

In contrast to its decision denying plaintiff's claim for inpatient benefits and the

numerous appeals that followed, MAMSI's denial of plaintiff's claim for PHP coverage was

relatively straightforward. According to MAMSI, the Group Certificate requires pre-

certification "for non-emergent and elective services" prior to admission, and MAMSI

considered the PHP treatment to be non-emergent and elective. (A.R. 236.) Though it appears

from the record that the River Oaks staff was informed during plaintiff's inpatient treatment on

November 3, 2004, that plaintiff must receive pre-certification before beginning the PHP

treatment that was planned to begin at the end of her inpatient treatment (A.R. 309-10, 776),

plaintiff did not seek pre-certification from MAMSI for the PHP, and instead she submitted a

claim for coverage on November 9, 2004, after her PHP treatment had begun. (A.R. 236.)

MAMSI denied plaintiff's claim for PHP treatment by letter dated November 10, 2004, and

informed plaintiff that she could file an appeal "within 180 calendar days . . .or the initial denial

will be recognized as the Health Plan's final decision." (A.R. 236-39.) Plaintiff never appealed

this denial to MAMSI.

It is "well-established" that "barring exceptional circumstances, parties aggrieved by

decisions of . . . plan administrators must exhaust the administrative remedies available to them under their . . . plans before challenging those decisions in court." *Commc'n Workers of Am. v. Am. Tel. & Tel. Co.*, 40 F.3d 426, 431, 428 (D.C. Cir. 1994).  ERISA itself does not specifically require the exhaustion of remedies available under health plans, but courts have uniformly applied this requirement "as a matter of judicial discretion." *Id.* at 432; *see also Hunter v. Metro. Life Ins. Co.*, 251 F. Supp. 2d 107, 110 (D.D.C. 2003).  Courts require exhaustion of administrative remedies for "several important purposes," among them to "enable[] plan administrators to apply their expertise and exercise their discretion to manage the plan's funds, correct errors, make considered interpretations of plan provisions, [to] assemble a factual record that will assist the court reviewing the administrators' actions," and perhaps thereby to "render subsequent judicial review unnecessary in many ERISA cases because a plan's own remedial procedures will resolve many claims." *Commc'n Workers of Am.*, 40 F.3d at 432; *see also Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980) (noting that the purposes of the exhaustion requirement are "to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned").  For these reasons, "[w]hen a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress, in Section 503 [of ERISA], assigned the primary responsibility for evaluating claims for benefits." *Zipf v. Am. Tel. & Tel. Co.*, 799 F.2d 889, 892 (3d Cir. 1986).

Plaintiff's argument that the PHP was merely "a continuation of the [inpatient] treatment that began on October 13, 2004" is belied that the fact that plaintiff submitted to MAMSI two

separate claims -- one for her inpatient treatment and one for the PHP -- and received two

separate and distinct denial letters.  (*See* A.R. 739, 307-08, 1-2, 236, 776, 236-40.)  Moreover, up

to and including the March 24, 2005 letter that plaintiff's counsel wrote directly to IPRO

requesting that it review MAMSI's denial of the PHP coverage along with the denial of her

inpatient claim, the correspondence regarding plaintiff's appeals referred specifically and

exclusively to her inpatient treatment during the period "from October 13, 2004 to November 8,

2004."  (A.R. 739; *see also* A.R. 4, 264-65, 549, 551.)  Plaintiff also argues that the "goals" of

the exhaustion doctrine have nevertheless been met because MAMSI "considered [her] claim in

its entirety, including a review of all the medical records."  (Pl. Mot. at 32; Pl. Reply at 15-17.)

To the contrary, MAMSI did *not* consider the merits of plaintiff's PHP benefits claim, as it

denied the claim solely on the grounds that plaintiff had failed to seek pre-certification for the

PHP treatment, which it claims was required by the Group Certificate.  (A.R. 236.)  Even if

MAMSI's interpretation of the pre-certification requirement in the Group Certificate was

erroneous, because plaintiff never asked MAMSI to reconsider this decision, there is no evidence

that MAMSI again applied its expertise or exercised its discretion to correct any potential errors

or make a "considered interpretation" of that provision.  *See Commc'n Workers of Am.*, 40 F.3d

at 432.  Thus, the "important purposes" of the exhaustion doctrine have not been met.  *Id.*

   In short, because plaintiff failed to exhaust her administrative remedies with respect to

her claim for coverage of her PHP treatment, MAMSI's November 10, 2004 denial of that claim

is upheld, and defendant's motion for summary judgment will be granted as to plaintiff's PHP

claims.

## CONCLUSION

Because MAMSI and the external reviewers of its benefits determination appear to have misapplied the governing standard, or have failed to adequately explain how the evidence supports their determination that inpatient benefits are not payable under the Criteria, the Court cannot uphold MAMSI's decision.  Accordingly, plaintiff's motion for summary judgment [Dkt. #34] is granted insofar as the Court remands the case to MAMSI for reconsideration of its decision regarding plaintiff's claim for coverage of her inpatient treatment during the period from October 13, 2004 to November 8, 2004.  Plaintiff's motion is otherwise denied. Defendant's motion for summary judgment [Dkt. #33] is granted in part and denied in part, and defendant's denial of plaintiff's claim for coverage of her PHP treatment is upheld because plaintiff failed to exhaust her internal administrative remedies.  Defendant's motion to strike the declaration of Mary Stock [Dkt. #40] is granted.  This case shall be remanded to MAMSI for reconsideration of plaintiff's claim for inpatient treatment benefits consistent with this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge


Date:   January 25, 2007